**Homer G. RAY, Jr.**

v.

**LEHMAN BROTHERS KUHN LOEB, INCORPORATED.**

**No. C82–206A.**

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 4, 1984.

Jay Stuart Youngblood, Atlanta, Ga., for plaintiff.

Paul W. Stivers, Rogers & Hardin, Atlanta, Ga., for defendant.

ORDER

RICHARD C. FREEMAN, District Judge.

This action is now before the court on the parties' cross motions for summary judgment on counts five, six, and seven of the plaintiff's Second Amended Complaint, Rule 56, Fed.R.Civ.P., and on motions to strike by both the plaintiff and defendant.

### I. *Procedural Motions*

Before addressing the summary motions the court will dispose of the two pending motions to strike. Defendant moves to strike the letter sent by the plaintiff's attorney to the court dated April 23, 1984. The letter requested that a conference be held to resolve a discovery dispute between the parties. Defendant argues that this letter should be stricken because it is an attempt by plaintiff's counsel to secure some action by the court without going through the formality of filing a motion. Plaintiff's counsel argues that because he had not been able to resolve this dispute with defendant's counsel and the court indicated that it would not accept any further discovery motions, writing a letter to the court was the only way to obtain guidance in how to resolve this dispute. The court will grant the defendant's motion to strike the letter of April 23, 1984. *See* Rule 7(b), Fed.R.Civ.P.

Plaintiff has filed a motion to strike the defendant's renewed motion for summary judgment which was filed on May 25, 1984. Plaintiff argues that the defendant's request for an extension of time to allow it to file the motion as of May 25 should also be denied. The court will grant the defendant's motion for an extension of time and will deny the plaintiff's motion to strike. The court finds that the plaintiff was not prejudiced by the filing of the defendant's motion one day after the May 24 deadline. Plaintiff was timely served with the motion on May 24 even though the motion was not filed with the court until the next day. The court notes, however, that by this ruling it

does not mean to condone the defendant's conduct. The parties are advised that in the future all extensions of time must be sought before the expiration of the established deadline.

## II. Cross Motions for Summary Judgment

In the Second Amended Complaint, filed on August 18, 1983, the plaintiff alleges manipulation of the market for the stock of Weatherford International, Inc., in violation of § 9(a)(2) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78i(a)(2); violation of the Georgia Securities Act of 1973, common law fraud, and violation of fiduciary duties; and violation of § 10b of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. The essence of these allegations is that the defendant Lehman Brothers Kuhn Loeb, Inc. (Lehman Brothers), by and through its employee Stuart Travis, manipulated the price of Weatherford International, Inc. (Weatherford) stock during the period of July 15, 1980, through December 23, 1980. Plaintiff argues that the defendant's alleged violation of § 9(a)(2) is a deceptive practice within the meaning of the Georgia Securities Act of 1973 and § 10b of the Securities Exchange Act of 1934. Plaintiff also asserts that the violation of § 9(a)(2) constitutes common law fraud and a violation of fiduciary duties under Georgia law.

Plaintiff Homer G. Ray, Jr. is a former customer of Lehman Brothers and Travis is the Lehman Brothers' account executive who handled Ray's account. Weatherford is a company in the oil services industry whose shares are traded on the American Stock Exchange. Weatherford had approximately 5.4 million shares outstanding during 1980.

## A. Facts

The following is a summary of what the parties agree are the undisputed facts in this case. From November 1978, through at least October 1981, the research department of Lehman Brothers recommended the purchase of Weatherford stock. Beginning in July 1980, Travis recommended Weatherford stock to a number of his customers and executed various purchases and sales of the stock for his customers' accounts. Between July 15 and September 29, 1980, Travis purchased approximately 155,000 shares of Weatherford for his customers. These purchases accounted for approximately 19% of the total purchases of Weatherford shares during this period. The daily trading volume in the stock during this time was about 14,600 shares.

On September 29, 1980, Travis purchased 4,000 shares of Weatherford for his personal account at $39.00 per share. On September 30, 1980, Travis bought 13,500 shares for his customers. These purchases accounted for 51% of the purchases in Weatherford stock that day. The stock closed at $42.00 per share, up three points on the day. The next day, October 1, 1980, Travis sold the 4,000 shares of Weatherford in his personal account for $42.00 per share.

During October 2 and 3, 1980, Travis bought 6,400 shares of Weatherford for his personal account at prices ranging from $42.00 to $42.75 per share. Between October 4 and November 12, Travis purchased approximately 198,000 shares of Weatherford for his customers. These purchases accounted for about 38% of the total purchases in the stock. The average daily volume in the stock during this period was approximately 19,500 shares. Travis' purchases for his customers averaged about 7,350 shares per day during this time. The price of Weatherford stock rose from $42.00 to $54.25 per share between October 4 and November 12, 1980.

On November 6, 1980, Travis sold 2,800 shares of Weatherford from his personal account at prices ranging from $49.625 to $50.00 per share. Travis bought 2,200 shares for his customers in the same day. He sold the remaining 3,600 shares of Weatherford in his personal account on November 12 at a price of $53.75 per share. On the same day he purchased approximately 10,300 shares for his customers.

After November 12, Travis' purchases for his customers were in lesser amounts. On December 23, the stock closed at $51.00 per share. From December 24, 1980 to January 7, 1981, Travis' purchases for his customers accounted for less than 2% of the total shares traded in the stock. During this time the price of Weatherford stock fell to $42.625 per share.

Travis bought shares of Weatherford stock for Ray's account on August 4 and 25, 1980; September 3 and 17, 1980; and October 17, 20, 21, and 29, 1980. These shares were sold on November 13, 14, 18, and 20, 1980. Ray realized a profit on these trades.

On November 25, 1980, Ray bought additional shares of Weatherford stock. More purchases were made in March and May 1981. In May 1981, the shares of Weatherford purchased on November 25, 1980, were split 3 for 2. These shares were sold at a loss in September 1981. Plaintiff seeks reimbursement for this loss on the theory that he purchased the shares on November 25, 1980, in a market that had been manipulated by Travis. The shares purchased in March and May 1981, were sold later the same year. These transactions are not included within the plaintiff's claim of market manipulation.

B. *Manipulation in Violation of § 9(a)(2)*

The allegations of manipulation are asserted in counts five, six and seven of the Second Amended Complaint. Plaintiff's claims in these counts are premised upon a finding that the defendant engaged in market manipulation in violation of § 9(a)(2) of the Securities and Exchange Act of 1934.

Section 9(a)(2) provides:

(a) It shall be unlawful for any person, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange (2) to effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a).

Section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e), creates an express private remedy for violations of section 9(a) and an implied private cause of action has been recognized under section 10(b) and Rule 10b–5, *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

To show a violation of section 9(a)(2) in a private suit under section 9(e), a plaintiff must plead and prove that

(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected the plaintiff's purchase or selling price.

*Chemetron Corp. v. Business Funds*, 682 F.2d 1149, 1164 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983), *on remand*, 718 F.2d 725 (5th Cir.), *rehearing granted*, 718 F.2d 730 (5th Cir.1983).

In support of his motion for summary judgment on the manipulation claim, the plaintiff argues that Travis effected a series of transactions in Weatherford, a security registered on a national exchange, and that this series created actual active trading in the security. Plaintiff asserts that the "purpose" element can be inferred from the circumstances of Travis' conduct. *See In the matter of Halsey Stuart & Co., Inc.*, 30 S.E.C. 106, 123–24 (1949).

Plaintiff relies on a portion of S.E.C. Release No. 34–3056, October 27, 1941, 11 F.R. 10967 (17 C.F.R. § 241.3056), for his contention that Travis acted with the intent and purpose of manipulating the market in

Weatherford stock. The release states, in part:

> On the one hand, let us suppose that a broker, believing a stock to be underpriced, enters into a buying program which, in view of the condition of the market, he knows will have the result of raising the price. From time to time he disposes of part of his purchases, ... to customers attracted either by the rising price or the increased activity, at the levels which his buying has thus created
>
> . . . . .
>
> [T]he broker will have effected a series of purchases creating active trading and raising the price of the security, and it will be difficult to avoid the inference that his transactions were affected for the illegal purpose of inducing others to buy.
>
> . . . . .
>
> The fact that the broker may have believed bona fide that the stock at higher levels would still be a good buy for his customers is immaterial.
>
> . . . . .
>
> ... the relevance of the sales is not that they are an indispensible element of the offense, but that they are of great evidentiary weight in determining the purpose with which the buying was undertaken.

Plaintiff maintains that the undisputed facts show that the defendant, by recommending the purchase of Weatherford stock felt it was underpriced; that Travis bought the stock for his own account and then purchased shares for his customers between September 29 and November 12, 1980; that Travis sold his own shares at the same time he was buying shares for his customers. Plaintiff stresses the fact that there was no lapse between the time Travis sold his own shares of Weatherford and the time he bought shares for his customers.

Plaintiff argues that because purchases executed by Travis accounted for 38% of the volume in Weatherford trading between September 29 and November 12, 1980, Travis knew that such extensive purchases would be bound to cause changes in the market price of the stock. Plaintiff points out that both the plaintiff's and defendant's expert witnesses stated that a one hundred share order could alter the price of a stock. *See* Seman Deposition Vol. II, at 316, Frankhauser Deposition, at 14.

Plaintiff maintains that section 9(a)(2) was designed to prevent the situation that occurred in this case. "Section 9(a)(2) was aimed at preventing an individual from dominating the market in a stock for the purpose of conducting a one-sided market at an artificial level for its benefit and to the detriment of the investing public." *Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787, 794 (2d Cir.1969). Travis had a pecuniary interest in the price of Weatherford stock and profited from his personal holdings in the stock. Defendant Lehman Brothers had an investment banking relationship with Weatherford and at least one officer of Lehman Brothers was on the Board of Directors of Weatherford. Plaintiff contends that these facts prove that the purpose of Lehman Brothers, by and through its employee Travis, was to recommend and induce the purchase of Weatherford Stock, thus establishing all the elements necessary to prove a violation of section 9(a)(2).

Defendant argues that summary judgment should be granted in its favor because there is no evidence to support the plaintiff's claim of market manipulation in Weatherford stock. Defendant asserts that all the evidence, including that of both the parties' expert witnesses, shows that the plaintiff's purchase of Weatherford stock were made in a normally functionally, efficient auction market. There is no evidence, the defendant maintains, that Travis' customers bought Weatherford stock at a false price or that Travis' trading affected the price of the stock.

Defendant argues that the plaintiff cannot prove that the purchases he complains of, on November 25, December 9, and 23, 1980, were made "at a price which was affected by such [manipulation] act or

transaction." Section 9(e), 15 U.S.C. § 78i(e). Defendant asserts that there is no evidence that the defendant's conduct affected the price of Weatherford stock on or after November 25, 1980. *See Shull v. Dain, Kalman & Quail, Inc.,* 561 F.2d 152, 159 (8th Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Defendant contends that the term "affected price" in the section 9(e) does not mean the normal minor effect that any legitimate trading may have on the market price, but rather it means that the plaintiff must "either have entered a false market or paid a false price to enter a genuine market." *See Rosenberg v. Hano,* 121 F.2d 818, 821 (3d Cir.1941). Defendant asserts that the plaintiff's own expert testified that there was no reason to believe that any of Travis' customers entered false market or paid a false price when they purchased Weatherford stock. *See* Seaman Deposition, Vol. II, at 272–87. Defendant argues that the plaintiff has failed to produce any evidence that any transactions which were recommended by Travis ever caused an artificial change in the price of Weatherford or created a false price for the stock.

Defendant also maintains that the plaintiff has failed to present evidence from which to infer that Travis acted with the purpose of manipulating the market in Weatherford stock, and thus has failed to prove an element necessary to state a cause of action under section 9(a)(2). There is no violation of this section, the defendant contends, unless the purpose of the transaction at issue was to stimulate an artificial demand for shares with a consequent rise in price from which the trader can profit. Defendant asserts that the "purpose" requirement must be interpreted in light of the objective of section 9(a)(2) which is to eliminate devices "used to persuade the public that activity in a security is a reflection of genuine demand instead of a mirage." Stock Exchange Practices, Report of the Commission on Banking and Currency, S.Rep. No. 1455, 73d Cong.2d Sess. 54 (1934). Defendant maintains that a person's knowledge that acquiring or disposing of a large holding in a security will affect the market price does not make his action in doing so unlawful. *See* H.R.Rep. No. 1383, 73d Cong., 2d Sess. 20 (1934); *Crane,* 419 F.2d at 794.

Defendant argues that there is no evidence that Travis purchased shares of Weatherford for his own account or recommended the stock to his customer with the purpose of profiting from an artificial price rise rather than a price determined by the normally operating market. Defendant points out that Travis' recommendations of the stock were consistent with the recommendations which had been made by the defendant's research department since 1978. Defendant argues that Weatherford's price movement during the period of the alleged manipulation paralleled that of comparable stocks in the industry, as did its subsequent decline in price in 1981.

Defendant maintains that Travis' trading in Weatherford for his own account could have had no effect on the price the plaintiff paid for Weatherford on or after November 25, 1980, and thus could not constitute market manipulation of the stock. Travis' trades for his personal account occurred in September and October, two months after the plaintiff asserts that the manipulation began. Although the plaintiff alleges that the manipulation continued through December 23, 1980, the defendant argues that because Travis personally held no position in Weatherford after November 12, 1980, he could not have profited from the plaintiff's purchases on November 25, December 9 and 23, 1980.

The court may grant a motion for summary judgment only if the record demonstrates beyond doubt that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984). The court is satisfied that no questions of material fact exist in this action. Viewing the evidence and all factual inferences in the light most favorable to the plaintiff, the court finds that the defendant is entitled to summary judg-

ment on the plaintiff's market manipulation claims.

■ For the plaintiff to succeed on the market manipulation claims the court would have to find that Travis' trading activity in Weatherford, including his activity after November 12, 1980, when his trades accounted for approximately 2% of the total trading volume in the stock, constituted "a series of transactions in [a] security ... creating actual or apparent active trading in [the] security, or raising or depressing the price of [the] security, for the purpose of inducing the purchase or sale of such security by others." *See* section 9(a)(2). The court finds that the evidence presented fails to support these contentions.

The court finds that because Travis had no holdings in Weatherford after November 12, 1980, and his trading in the stock for his customers was greatly reduced after this date, there is no evidence that would support a finding that Travis created an artificial rise in price of the stock or a false market in the stock as of November 25, 1980. Nor is there evidence to support the plaintiff's contention that Travis intended to profit from the alleged artificial price paid by the plaintiff for the stock. Travis had sold all his Weatherford stock as of November 12, and thus could not profit from any purchase by Ray of the stock on November 25 or later.

■ Section 9(a)(2) does not condemn extensive buying of a security or buying which raises the price of a security such as Travis may have engaged in from September through early November. A specific purpose to manipulate a security is required to establish a violation of the section. *See Crane,* 419 F.2d at 794 (2d Cir. 1969).

Plaintiff has failed to produce any evidence which would support a finding that Travis had a specific purpose to manipulate the market in Weatherford stock. "The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to

keep an open and free market where the natural forces of supply and demand determine a security's price." *Trane Co. v. O'Connor Securities,* 561 F.Supp. 301, 304 (S.D.N.Y.1983). It is undisputed that Travis held no Weatherford stock for his own account after November 12 and that his purchases for his customer were in lesser amounts after that date. There is no evidence, therefore which would support a finding that Travis' activities interfered with the natural forces of supply and demand in determining the price of or market for Weatherford stock on or after November 25, 1980. Defendant's expert testified that there are none of the hallmarks of manipulative activity, (e.g. wash sales, painting the tape through a series of transactions for a syndicate account, inducing specialists' support for the stock) in the transactions in this case nor any evidence that the market for the stock was not functioning normally. *See* Frankhauser Deposition, at 20–27, 93; Frankhauser Affidavit at ¶ 8, 9. Plaintiff's expert witness also testified that the "primary periods" that he found "suggestive of Stuart Travis having definite impact [on Weatherford trading] would be the October 13th to 15th period and the October 20th to 23rd period." Seman Deposition, Vol. II, at 184. Plaintiff's expert also testified, however, that he would not say that the trading activity in Weatherford by Travis during September and October was responsible for price of Weatherford stock on or after November 25, 1980. *Id.* at 231. He further testified that he could not attribute the rise or decline in the price of Weatherford to any single factor or to any group of factors, but that the substantial drop in price by Weatherford that began at the end of November 1980, was the result of market factors generally in the oil and oil service companies. *Id.* at 231–32, 284.

The court finds that the plaintiff has failed to produce evidence to meet the requirements of section 9(a)(2). Ray has not shown that Travis acted to create actual or apparent trading in Weatherford, raise or depress the price of the stock for the purpose of inducing purchases or sales of the

stock by others, or that the price Ray paid for Weatherford stock purchased in late November and December 1980 was affected by Travis' activities. Plaintiff has also failed to show that Travis acted with the motive and willfulness required to make out a claim under section 9(e). The court will grant summary judgment for the defendant on the market manipulation claims.

Accordingly, the defendant's motion for summary judgment on counts five, six, and seven of the second amended complaint is GRANTED. Defendant's motion to strike is GRANTED. Plaintiff's motion to strike is DENIED.