190 F.3d 37 (2nd Cir. 1999)
 MORDECHAI GURARY, Plaintiff-Appellant-Cross Appellee,
V.
ISAAC WINEHOUSE and ISAAC WINEHOUSE, doing business as Wall & Broad Equities, Defendants-Appellees,
and
NU-TECH BIO-MED, INC., Defendant-Appellee-Cross-Appellant.
 Nos. 98-7239(L), 98-7280(XAP)
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: October 16, 1998
Decided: August 24, 1999
 
 1
 Appeal and cross-appeal from a decision of the United States District Court for the Southern District of New York (Louis L. Stanton, Judge), granting defendants' motions for summary judgment dismissing the complaint and denying the motion of defendant Nu-Tech Bio-Med, Inc. for sanctions.
 
 
 2
 Affirmed in part, vacated and remanded in part. [Copyrighted Material Omitted]
 
 
 3
 Before: WALKER, Circuit Judge, OAKES, Senior Circuit Judge, and KAPLAN, District Judge.*
 
 
 4
 KAPLAN, District Judge.
 
 
 5
 Plaintiff appeals from a judgment of the district court (Stanton, J.) to the extent that it dismissed the plaintiff's claims under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10b-5 thereunder on the merits and his pendent state claims for lack of subject matter jurisdiction. One of the defendants cross-appeals from so much of the judgment as denied so much of its motion as sought sanctions under the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). We affirm so much of the judgment as dismissed plaintiff's case. We vacate and remand insofar as it denied the application for sanctions.
 
 
 6
 * Nu-Tech Bio-Med, Inc.("Nu-Tech") was formed in 1981. Its common stock, which is the security that allegedly was manipulated, is traded on NASDAQ.
 
 The Nu-Tech Convertible Preferred
 
 7
 In late 1996,[1] at a time when Nu-Tech common stock was trading at about $15 per share, Nu-Tech raised $14 million by issuing 14,000 shares of Series A Convertible Preferred Stock in a private placement at a price of $1,000 per share. This security had no voting rights and paid no dividends but was convertible into common at the lesser of (1) $17.50 per share, and (2) 75 percent of the average closing bid price of the common for the five trading days prior to the date of the holder's notice of conversion, with one-third of the holder's shares being convertible on each of the forty-fifth, the seventy-fifth, and the one hundred-fifth day after issuance. Nu-Tech was obliged to register the common stock into which the preferred was convertible. These characteristics had several notable implications.
 
 
 8
 First, the facts that the preferred (a) paid no dividends, (b)had no voting rights, and (c) was convertible to common at a bargain price, and that (d) the conversion right expired following the one hundred fifth day following issuance meant that the preferred almost inevitably would be converted.[2]
 
 
 9
 Second, purchasers of the preferred were likely to profit no matter what happened to the price of the common stock, provided only that the company survived. If the common traded below $23.33 per share immediately prior to conversion, the preferred would be converted at 75 percent of the price of the common (which would be less than $17.50). As long as the price of the common did not fall more than 25 percent following the conversion, the preferred shareholder would profit by conversion and sale of the common into which the preferred was converted.[3] If the common traded above $23.33 immediately prior to conversion, the preferred would be converted at $17.50 (which would be less than 75 percent of the trading price of the common), thus virtually assuring an even greater profit.
 
 
 10
 Third, even if the preferred were to be converted into the minimum number of common shares,[4] the preexisting common stock holders would be diluted very substantially. At the minimum conversion ratio of 57.14 shares of common per share of preferred, conversion of the entire issue of preferred would result in the issuance of 799,970 additional shares of common, whereas Nu-Tech had only about 2.4 million shares outstanding at the time of the private placement. Conversion at higher ratios (i.e., when the price of the common was below $23.33 per share) would increase the number of shares issued and therefore the dilution. Indeed, a sufficiently substantial drop in the price of the common could increase the conversion ratio so much that conversion would result in the former preferred shareholders owning a majority of the company's post-conversion common stock. Thus, the existence of the convertible preferred, in and of itself, doubtless exerted downward pressure on the price of the common.
 
 Winehouse's Alleged Scheme
 
 11
 The complaint alleges that defendant Isaac Winehouse, doing business as Wall & Broad Equities, organized a "cartel" to purchase a percentage of the Nu-Tech convertible preferred in the names of nominees. He then allegedly arranged for a number of securities firms to become market makers in Nu-Tech common stock and proceeded to sell the common short, allegedly to drive the price of the common stock down.
 
 
 12
 The Dealings Among Nu-Tech, Winehouse and Plaintiff
 
 
 13
 Plaintiff Mordechai Gurary purchased 1,000 shares of Nu-Tech common on October 31, 1996 and another 5,500 shares on November 7, 1996 at $14.60 and $15.50 per share, respectively. In or about December 1996, the stock price began to decline. A concerned Gurary spoke to J. Marvin Feigenbaum, chairman of Nu-Tech. Feigenbaum told him that he had spoken to Winehouse and threatened that Nu-Tech would refuse to register the common stock into which the preferred was convertible unless Winehouse and his group stopped shorting the common. He predicted that this threat would convince Winehouse to stop shorting the stock because a refusal to register the common issued upon conversion would force Winehouse to cover his short position by purchasing Nu-Tech common in the open market, perhaps at higher prices. Gurary, evidently comforted, then purchased another 1,000 shares on December 24, 1996 at a price of $11.75 per share.
 
 
 14
 Gurary claims subsequently to have learned that Winehouse and his associates had continued to short the stock using nominee names, having arranged to "borrow" an unlimited number of shares for that purpose from market makers. On February 18, 1997, Gurary again spoke to Feigenbaum, who told him that he had met that day with Winehouse and others in another attempt to stop the short selling. Feigenbaum told Gurary that Nu-Tech had offered to repurchase the group's preferred shares at cost plus ten percent and to allow it to keep its existing profits from the short sales if the group would stop its activities but that Winehouse had refused. Feigenbaum, however, told Gurary that Nu-Tech would not give in to Winehouse and would refuse to register the short sellers' shares. Later that day, Gurary bought another 8,350 shares of Nu-Tech common at a price of $11.57.
 
 
 15
 On March 12, 1997, Feigenbaum and another Nu-Tech board member met again with Winehouse and asked that Winehouse and his group accept registration of the common stock into which their preferred was convertible over a period of twelve months rather than insisting that it be registered immediately. Winehouse again refused and said that he would continue to sell short.
 
 
 16
 Nu-Tech common stock dropped approximately $6 per share over the next two days. On March 14, 1997, the company issued a press release which stated that the price decline could be attributed to "possible sales by shareholders." No mention was made of the discussions between Nu-Tech and Winehouse, allegedly to avoid disrupting Nu-Tech's efforts to acquire Physicians Clinical Laboratory, Inc. ("PCL") out of bankruptcy.
 
 
 17
 A few days later, Gurary was approached through an intermediary and spoke with Winehouse, who allegedly admitted to him that he deliberately had shorted the stock to drive the price down, said that he intended to continue, and advised Gurary to sell his shares because the price would drop to "a dollar."
 
 Proceedings Below
 
 18
 Plaintiff commenced this action against Nu-Tech and Winehouse on May 23, 1997. The complaint contains three relevant claims for relief.[5] The first charges Winehouse with manipulation of Nu-Tech's common stock in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 C.F.R.§ 240.10b-5, by the purchase of the convertible preferred and the shorting of the common.[6] The second claim is against Nu-Tech and charges a 10b-5 violation in that Nu-Tech, motivated by a desire to avoid having Winehouse and other short sellers object to its effort to acquire certain debt securities of PCL in a transaction requiring bankruptcy court approval, "failed to reveal the sale to Winehouse and his group through the use of nominees, that there were meetings going on between Winehouse and his group and Nu-Tech; that Nu-Tech was aware of the short-selling by Winehouse and his group; [and] that Nu-Tech would refuse to register certain stocks due to the short-selling activities of Winehouse and his group . . ." In addition, it charges that Nu-Tech's March 14, 1997 press release was misleading for failure to disclose Winehouse's short sales and the discussions between Nu-Tech and Winehouse. The third claim for relief alternatively seeks recovery from both defendants under Section 349 of the New York General Business Law.
 
 
 19
 Both defendants moved to dismiss the complaint for failure to state a claim upon which relief may be granted. Gurary opposed the motions and submitted a nine page affidavit in which he recounted his conversations with Messrs. Feigenbaum and Winehouse in greater detail than was included in the complaint. His attorney also submitted an argumentative affidavit that claimed no personal knowledge of anything relevant to the case, but that suggested that Winehouse had violated Section 5 of the Securities Act, 15 U.S.C. § 77e.
 
 
 20
 In disposing of the motions, Judge Stanton specifically relied upon Gurary's affidavit, thus converting them into motions for summary judgment pursuant to Rule 12(b). He noted that the case was based on four purchases of Nu-Tech common stock by Gurary, two of which preceded the alleged commencement of the short selling and the other two of which were made after Gurary learned of the short sales from Feigenbaum. He therefore dismissed the Rule 10b-5 claim against Winehouse with respect the first pair of purchases on the ground that Winehouse's allegedly manipulative short sales were not made "in connection with" those purchases. He dismissed the 10b-5 claim based on the second pair of purchases on the ground that plaintiff's knowledge of the facts defeated any claim "of reliance upon any but the true picture." He dismissed the Rule 10b-5 claim against Nu-Tech because the complaint failed to allege that any of Feigenbaum's statements to plaintiff was false when made. Having held the federal claims insufficient, Judge Stanton dismissed the state law claims for lack of subject matter jurisdiction. Judgment was entered accordingly.
 
 
 21
 Plaintiff appeals from the judgment. Nu-Tech cross-appeals insofar as the district court failed to grant sanctions against plaintiff pursuant to the PSLRA, 15 U.S.C. § 78u-4 et seq.
 
 II
 
 22
 Plaintiff argues first that the district court erred by considering his own affidavit and thus converting the motions into motions for summary judgment. Having done so, he contends, the court erred further by deciding them without giving the plaintiff an opportunity to conduct discovery.
 
 Conversion of the Motion
 Rule 12(b) provides in relevant part:
 
 23
 "If, on a motion asserting the defense numbered (6) to dismiss for a failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."
 
 
 24
 We frequently have held that a district court ordinarily must give notice to the parties before converting a motion to dismiss pursuant to Rule 12(b)(6) into one for summary judgment and considering matters outside the pleading. E.g., Kopec v. Coghlin, 922 F.2d 152, 154-55 (2d Cir. 1991). This is simply an application, however, of the principle that parties are entitled to a reasonable opportunity to present material pertinent to a summary judgment motion. Hence, "[c]ompliance . . . is not an end in itself. * * * The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of reasonable opportunity to meet facts outside the pleadings." In re G. & A. Books, Inc., 770 F.2d 288, 295 (2d Cir. 1985), cert. denied sub nom. M.J.M. Exhibitors, Inc. v. Stern, 475 U.S. 1015 (1986).
 
 
 25
 In this case, it was plaintiff who submitted the affidavit relied upon by the district court and who thus invited Judge Stanton to rely not only on the complaint, but upon the more elaborate explication of plaintiff's grievance contained in his affidavit. He certainly cannot be heard to claim that he was surprised when the district court accepted his invitation. Indeed, the district court arguably would have erred in declining to do so. See Freeman v. Marine Midland Bank, 494 F.2d 1334, 1338-39 (2d Cir. 1974) (error to disregard affidavits submitted by plaintiff in opposition to a motion to dismiss). In consequence, the motions properly were converted.
 
 Rule 56(f)
 
 26
 Plaintiff's claim that the court below erred in deciding the motions without giving him an opportunity to conduct discovery also lacks merit.
 
 Rule 56(f) provides:
 
 27
 "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition [to a motion for summary judgment], the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."
 
 
 28
 Thus, as we often have said, a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing "'(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.'" Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995) (quoting Hudson River Sloop Clearwater, Inc. v. Department of Navy, 891 F.2d 414, 422 (2d Cir. 1989)); accord, Paddington Partners v. Bouchard, 34 F.3d 1132, 1137-38 (2d Cir. 1994); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 926 (2d Cir. 1985). Indeed, the failure to file such an affidavit is fatal to a claim such as plaintiff makes here even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law. Paddington Partners, 34 F.3d at 1137.
 
 
 29
 The affidavits plaintiff submitted in the district court did not contend that any discovery was required to meet the defendants' motions, let alone satisfy the test articulated most recently in Meloff. Indeed, plaintiff did not even hint below at any need for discovery in order to resist defendants' motions. In consequence, the court below plainly did not err in passing on the merits of the motions in the absence of any discovery.
 
 III
 
 30
 Plaintiff's attack on the dismissal of his Rule 10b-5 claim against Nu-Tech is limited to the claim that he was deceived in making his December 24, 1996 and February 18, 1997 purchases because he relied upon Feigenbaum's declarations that Nu-Tech would not register the common into which the Winehouse group's preferred was convertible and that this should or would stop it from selling the common short.[7] But this argument too is without merit.
 
 
 31
 To begin with, this theory is not the basis of the Rule 10b-5 claim against Nu-Tech set forth in the complaint and in Gurary's affidavits, which in essence was that Nu-Tech had failed to disclose what it knew of Winehouse's activities. While the papers described Gurary's alleged conversations with Feigenbaum, the articulated grievance against Nu-Tech was its alleged concealment of the short-selling activities, allegedly in order to protect its efforts to buy PCL. Having failed to make the present argument to the district court, plaintiff will not be heard to advance it here. E.g., Mycak v. Honeywell, 953 F.2d 798, 803 (2d Cir. 1992); Schmidt v. Polish People's Republic, 742 F.2d 67, 70 (2d Cir. 1984). Even if the argument were properly before us, however, it would lack merit.
 
 
 32
 It is important to recognize that plaintiff's contention with respect to his pivotal conversations with Feigenbaum is that Feigenbaum allegedly stated that Nu-Tech would block the registration of the common. He spoke in the future tense. The statements therefore were ones of intention or of a promissory nature.
 
 
 33
 In order to state a claim under Rule 10b-5, the plaintiff must "allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security." Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)). "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew than he could not perform." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993).
 
 
 34
 Here, there is no suggestion in the complaint or in Gurary's affidavit that Feigenbaum did not intend to do just what he promised at the times he made the statements to which Gurary now points. In consequence, the claim now advanced against Nu-Tech is fundamentally flawed. The complaint was properly dismissed against the corporate defendant.
 
 IV
 
 35
 We come now to the manipulation claim against Winehouse.
 
 The Final Purchases
 
 36
 Plaintiff's last two purchases of Nu-Tech shares, which occurred on December 24, 1996 and February 18, 1997, are readily disposed of. He made each just after speaking with Feigenbaum concerning Winehouse's short selling and having been told that Nu-Tech would refuse to register the common into which Winehouse's preferred was convertible, thus preventing him from covering his short position with newly issued common and thereby perhaps deterring further short selling. In consequence, Gurary made each of these purchases in the belief that the prices he paid reflected Winehouse's allegedly manipulative activities.
 
 
 37
 The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators. Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 12 (1985). In order to make out a 10b-5 claim, moreover, the plaintiff must allege and prove, among other elements, reliance. E.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995). In consequence, a private plaintiff in such a case must establish that he or she engaged in a securities trade in ignorance of the fact that the price was affected by the alleged manipulation. See Ray v. Lehman Brothers Kuhn Loeb, Inc., 624 F. Supp. 16, 19 (N.D. Ga. 1984) (plaintiff in § 9(e) manipulation case must show reliance on false appearance of actual or apparent trading). By plaintiff's own admission, this requirement is not satisfied with respect to these two purchases. Judge Stanton therefore correctly dismissed his claim based upon them.
 
 The Initial Purchases
 
 38
 Plaintiff's initial purchases of Nu-Tech shares were made on October 31 and November 7, 1996. The alleged manipulation is said to have begun "following [the Winehouse group's] acquisition of a large part of the . . . Series A Convertible Preferred . . ." (Cpt ¶ 24)
 
 
 39
 The district court's dismissal of the claim based on the first purchase was correct. Gurary concedes that the alleged manipulation did not begin until at least November 6, 1996. In order to make out a claim under Rule 10b-5, however, the plaintiff must allege culpable deception "in connection with the purchase or sale of a security . . ." E.g., Acito, 47 F.3d at 52. Quite clearly, any deception inherent in the execution of a manipulative scheme beginning on or after November 6 was not "in connection with" plaintiff's purchase on October 31. See, e.g., Samuel M. Feinberg Testamentary Trust v. Carter, 652 F. Supp. 1066, 1080 (S.D.N.Y. 1987).
 
 
 40
 The matter is not so clear with respect to the second purchase. The complaint alleges that the "initial issue date" of the preferred was November 6, 1996 (Cpt ¶ 21), the day prior to plaintiff's second purchase. In consequence, if one were to assume that the Winehouse group acquired its preferred stock on November 6 and, as the complaint alleges, that the manipulation began "following the acquisition" of the preferred, the November 7 purchase might have been made at the very start of the alleged manipulation. Plaintiff therefore argues that the district court erred in dismissing his claim based on the second purchase because there was an issue of fact as to whether the alleged manipulation began after the second purchase. But this contention is insufficient to save the complaint.
 
 
 41
 Viewing the complaint in the light most favorable to plaintiff, he alleges that the scheme to depress the stock began on the day prior to or the very day of the plaintiff's November 7 purchase. The price at which plaintiff purchased on that date, he alleges, was $15.50 - 90 cents per share or 6.2 percent higher than his previous purchase, which concededly antedated the start of the attempt to drive the stock down. But we need not assume that the price plaintiff paid on November 7 was not affected by any short selling, likely as that seems, as the very fact that Gurary was a buyer in a market allegedly depressed by a manipulative scheme is an insurmountable obstacle to his claim based on that purchase.
 
 
 42
 If Winehouse actually did depress the price of the shares on November 7, plaintiff benefitted from that price decline by purchasing at a lower price than he otherwise would have paid. As a general matter, a defrauded buyer is entitled under Rule 10b-5 to recover "only the excess of what he paid over the value of what he got." Levine v. Seilon, Inc., 439 F.2d 328, 334 (2d Cir. 1971) (Friendly, J.); accord, e.g., Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 168 (2d Cir. 1980).[8] Where, as here, a buyer pays less for a security by reason of a defendant's fraud or manipulation, there is no excess of price over value, so the buyer may not recover. Indeed, that is no more than a common sense application of Section 28(a) of the Exchange Act, which provides that "no person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of his actual damages on account of the act complained of." 15 U.S.C. § 78bb(a). Moreover, it would be anomalous indeed to permit a plaintiff to recover damages where the characteristic that made the conduct complained of unlawful, here the allegedly artificial depression of the price, worked to plaintiff's benefit. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) (plaintiff claiming injury caused by enhanced competition resulting from merger lacked standing to sue for damages on theory that merger violated antitrust laws because alleged injury not caused by that which allegedly rendered merger unlawful).[9]
 
 V
 
 43
 Finally, we turn to Nu-Tech's cross-appeal from the denial of its motion for sanctions pursuant to Section 21D of the Exchange Act, as added and amended by the PSLRA, 15 U.S.C. § 78u-4.
 
 
 44
 Section 21D(c)(1), 15 U.S.C. § 78u-4(c)(1), provides in relevant part that, upon final adjudication of any private action arising under the Exchange Act, "the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." If the court finds such a violation, "the court shall impose sanctions," although only after giving the party or attorney involved notice and an opportunity to respond. Id. § 78(c)(2).
 
 
 45
 In this case, Nu-Tech moved for the imposition of sanctions pursuant to this statute. Although the judgment implicitly denied Nu-Tech's motion, the district court made no findings regarding compliance with Rule 11(b). As the statute required the district court to make findings, we have no choice but to remand in order to permit it to do so.
 
 VI
 
 46
 The judgment appealed from is affirmed insofar as it granted summary judgment dismissing the complaint[10] but vacated insofar as it denied Nu-Tech's motion for sanctions. The case is remanded with respect to sanctions for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.
 
 
 [1]
 The complaint alleges that the initial issue date was November 6, 1996. A registration statement for a subsequent sale of common stock states that the placement was completed on December 2, 1996.
 
 
 [2]
 In addition, Nu-Tech had the right to force conversion commencing 270 days following the completion of the private placement.
 
 
 [3]
 For example, if the common continued to trade at its preconversion price, but at any price below $23.33, the preferred shareholder would gain a constant $333.33 per share by converting and selling the newly issued common.
 
 
 [4]
 The conversion price of the lower of $17.50 or 75 percent of the trading price of the common meant that the number of shares into which each share of preferred was convertible could not fall below 57.14.
 
 
 [5]
 The fourth claim for relief sought a preliminary injunction barring Nu-Tech from registering the convertible preferred pending the determination of the action. Plaintiff, however, never moved for a preliminary injunction. Moreover, the complaint alleges that the convertible preferred was issued in December 1996 in a private placement subject to Regulation D under the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act"). In consequence, the issuance of the convertible preferred was exempt from registration. 15 U.S.C. § 77d(2); 17 C.F.R. §§ 230.501-08 (1998).
 
 
 [6]
 It charges also that "the defendants made numerous misstatements of material facts and omissions to state material facts necessary in order to make statements not misleading." As it does not identify any such misstatements or omissions in the first claim for relief, this aspect of the complaint fails to comply with FED. R. CIV. P. 9(b) and may be disregarded.
 
 
 [7]
 Appellant's Brief ("App. Br.") 29-30. He thus has abandoned any other claims against Nu-Tech, including the contention that the March 14, 1997 press release was misleading.
 
 
 [8]
 To the extent that it suggested that a defrauded buyer never may recover on a benefit-of-the-bargain theory, Levine was dictum. See e.g., McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995), cert. denied, 517 U.S. 1190 (1996); Commercial Union Assur. Co. v. Milken, 17 F.3d 608, 614-15 (2d Cir.), cert. denied, 513 U.S. 873 (1994); Barrows v. Forest Labs., Inc., 742 F.2d 54, 59-60 (2d Cir. 1984); Osofsky v. Zipf, 645 F.2d 107, 111-12 (2d Cir. 1981). That qualification, however, has no bearing in this case.
 
 
 [9]
 Plaintiff alleges also that the price of Nu-Tech common later fell, ultimately to about $2 per share by the time suit was filed in May 1997. It is not entirely clear from the complaint that he seeks to recover for that decline, as his grievance seems to be that he purchased at prices artificially affected by the alleged manipulation. (Cpt ¶ 42) In any case, however, plaintiff may not recover for the decline in the price of his holdings subsequent to his purchases.
 Section 10(b) and Rule 10b-5 prohibit fraud only "in connection with" the purchase and sale of securities. Accordingly, only a purchaser or seller may sue thereunder. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Plaintiff nowhere alleges that he sold any shares. To whatever extent that he seeks compensation for the decline in the price of Nu-Tech shares caused by allegedly manipulative short sales in the period following his purchases, the loss was not the product of fraud in connection with the purchase or sale of securities by Gurary and therefore is not recoverable. See Blue Chip Stamps, supra, 421 U.S. at 737-38 (decline in value of stock allegedly held in consequence of fraudulent statement not recoverable); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956 (1952) (same); see also First Equity Corp. v. Standard & Poor's Corp., 869 F.2d 175, 180 n.2 (2d Cir. 1989) (10b-5 plaintiffs "may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading"); Elkind, 635 F.2d at 170-71 (defrauded buyer could not recover for subsequent price decline because not "in connection with" the purchase); Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977), cert. denied, 436 U.S. 905, 913 (1978) ("requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities").
 
 
 [10]
 The district court's dismissal of the state law claims for lack of jurisdiction once it correctly dismissed the federal claims was entirely appropriate. See 28 U.S.C. § 1367(c)(3).