Jonathan S. GREENWALD, Plaintiff,

v.

**ORB COMMUNICATIONS & MARKETING, INC., Andrew S. Pakula; and Laura Berland, Defendants.**

**No. 00 CIV.1939(LTS).**

United States District Court, S.D. New York.

April 2, 2002.

Wolf Haldenstein Adler, Freeman & Herz LLP, By David A.P. Brower, Esq., Demet Basar, Esq., New York, for Plaintiff Jonathan S. Greenwald.

Mitchell R. Schrage & Associates, By Mitchell R. Schrage, Esq., New York, for Defendants Orb Communications & Marketing, Inc., Andrew S. Pakula and Laura Berland.

## OPINION AND ORDER

SWAIN, District Judge.

This civil case, in which plaintiff Jonathan S. Greenwald ("Greenwald" or "Plaintiff") asserts securities fraud and state law claims in connection with a private placement, is before the Court on the motions of defendants Orb Communications & Marketing ("Orb Communica-

tions"), Andrew S. Pakula ("Pakula") and Laura Berland ("Berland") (together, the "Defendants") to dismiss the complaint ("Complaint") on the grounds that it fails to state a claim under the federal securities laws and that the state law claims in the Complaint should be dismissed because, absent a viable federal claim, there is no basis for the Court to retain jurisdiction.

The Complaint alleges that Defendants violated section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") (15 U.S.C.A. § 78j(b) (West 1997 & Supp. 2000)) and Rule 10b–5 promulgated thereunder (17 C.F.R. § 240.10b–5 (2001)), and are liable under section 20(a) of the Exchange Act. The Complaint also asserts common law fraud, breach of contract, quantum meruit, and unjust enrichment claims against the Defendants.

For the following reasons, Defendants' motion is granted.

## FACTS

The following facts are alleged in the 38–page Complaint.[1] Defendant Orb Communications provides internet marketing services to clients through e-commerce technology, certain software applications and marketing consulting services. Its core technology, software called ORBit 4.0, provides for real-time online marketing campaign management. Complaint ¶ 11.

Greenwald is the owner of Interactive Capital Inc., ("IAC"), a New York based financial consulting firm which provides business development and advisory services to developing companies in the technology sector. *Id.* ¶ 3, 12. Greenwald is also a representative of Oxbridge Incorpo-

---

1. In determining a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must take as true the allegations of the complaint. *See infra* pp. 224–25.

rated ("Oxbridge"), a New York-licensed broker-dealer. *Id.* ¶ 13.

On or about June 18, 1999, Andrew Lewin and Frank Lunn, investment bankers at First Albany Corporation ("First Albany"), approached Greenwald about the possibility of Greenwald providing advisory services to Orb Communications in connection with a proposed private placement. *Id.* ¶ 14.

On that same day, Pakula sent Greenwald a copy of Orb Communications' current executive summary (the "Executive Summary"), which, among other things, described Orb Communications' putative proprietary assets—including ORBit 4.0 and related software called ORBit Express, POPsite Marketing and AdMetrix. The Executive Summary also stated: "Through April 1999, the company's revenues exceeded $300,000 while booking orders and closing on contracts in excess of $5,300,000 through December 31, 1999." The Executive Summary further projected that 1999 gross revenues would reach $6.8 million. *Id.* ¶ 15; Exh. A to the Complaint.

In a telephone conversation later that day, Pakula told Greenwald that the revenue figures in the Executive Summary were outdated and that, in fact, the Orb Communications' 1999 revenues would be approximately $10 million. Pakula then asked Greenwald how he would value Orb Communications for purposes of a private placement to investors if Orb Communications engaged Greenwald's firm. Relying on Pakula's representation that the Company's 1999 revenues would be approximately $10 million. Greenwald told Pakula that, based on the private market valuations for similar Internet based enterprises, Orb Communications would be valued approximately at a multiple of 3 to 5 times 1999 revenues, or $30 million to $50 million. *Id.* ¶ 16.

On or about June 22, 1999, Greenwald met with Pakula and Matthew Greene ("Greene"), Orb Communications's Vice President of Business Development, at Orb Communications' offices in New York. Pakula and Greene provided Greenwald with an overview of Orb Communications' business and a brief demonstration of its technology. At this meeting, Pakula represented that Orb Communications' software, *i.e.*, ORBit 4.0 and related programs, was developed in-house and was proprietary. This representation was also reflected in the Executive Summary. *Id.* ¶ 17.

At the June 22, 1999 meeting and thereafter, Pakula and Berland stated to Greenwald that they had a close business relationship and worked well together. They also advised Greenwald of their dedication to Orb Communications and that each was a critical component of its success. *Id.* ¶ 18.

On or about June 28, 1999, Pakula told Greenwald that he was seeking to raise from $10 million to $15 million for Orb Communications and that he hoped to complete the financing as quickly as possible. Greenwald told Pakula that he could not comment on Orb Communications' capital needs without conducting a due diligence review of the Company's business and financial situation. Pakula stated that he was an experienced businessman who had built a number of successful enterprises and understood what was required to properly evaluate Orb Communications. Pakula told Greenwald that he would assemble a detailed, comprehensive information package and forward it to Greenwald promptly. Pakula further told Greenwald that, if Orb Communications retained Greenwald's firm to assist in the private placement, Pakula and Berland would provide whatever information might be required. *Id.* ¶ 19.

During this conversation, Greenwald suggested to Pakula that, given Orb Communications' need for an immediate cash infusion, Pakula should consider a two-staged funding process, whereby Orb Communications would raise an initial financing tranche on an interim or bridge financing basis and then begin raising a larger amount of a permanent financing. Pakula said that interim financing made a lot of sense for Orb Communications, but that he wanted to consult with his attorney, Neil Parent, before making a decision. *Id.* ¶ 20.

On or about June 29, 1999, Pakula informed Greenwald that Parent would permit Orb Communications to seek interim or bridge financing only if First Albany remained involved in the effort to raise capital. Pakula stated to Greenwald that, according to Parent, First Albany would participate only in a large offering of approximately $20 million. *Id.* ¶ 21.

Because the proposed engagement with Orb Communications contemplated fundraising, which required a broker-dealer's license, Greenwald suggested to Defendants that Orb Communications retain Oxbridge, which was a licensed broker-dealer, rather than IAC. Accordingly, on or about July 13, 1999, Oxbridge replaced IAC as the entity through which the proposed financing would be sought. Greenwald remained the principal advisor on behalf of Oxbridge. All parties were aware that Greenwald would receive compensation from Oxbridge for services he provided to Orb Communications on behalf of Oxbridge. *Id.* ¶ 22.

On or about July 13, 1999, Pakula asked Greenwald to prepare and present a fee proposal for Oxbridge's services in connection with the proposed private placement. Greenwald discussed with Lunn the appropriate fees for the contemplated assignment and they agreed on the fee proposal to be submitted to Pakula and Parent. Later that day, Lunn informed Greenwald that he had spoken with Parent and that Parent felt that, given the large amount of money to be raised, the proposed fees were too high. Parent, according to Lunn, refused to allow Orb Communications to pay even a retainer fee, although that was standard industry practice. According to Lunn, Parent also stated that a number of investment banks were also interested in Orb Communications and that Greenwald would have to reconsider his fee proposal if he wanted his firm to be hired. Lunn suggested that Greenwald waive his retainer fee and accept a lower success fee. He further stated that if Greenwald accepted this arrangement, he would "put in a good word" for Greenwald with Parent. Lunn also stated that, once Orb Communications formally retained Oxbridge and Greenwald was ready to begin marketing the private placement, Lunn would contact some of First Albany's venture capital clients and suggest they invest in Orb Communications. Lunn never arranged these meetings. Convinced that he would otherwise lose the assignment, Greenwald, on behalf of Oxbridge, agreed to waive the retainer fee and to accept a reduced success fee. *Id.* ¶ 23.

In or around mid-July 1999, Pakula informed Greenwald that Orb Communications would seek interim financing. Pakula asked Greenwald to arrange interim financing in the amount of $250,000 to $500,000. Pakula explained that he and Parent had determined that the interim financing should be funded by no more than one or two investors, given the larger permanent financing tranche to follow, which First Albany and Oxbridge were supposed to handle. Pakula then asked Greenwald if he would agree to provide the interim financing himself. *Id.* ¶ 24.

Greenwald responded that he was interested, but that he wanted to review the terms of the proposed transaction and complete his due diligence. Pakula said that Orb Communications had an existing noteholder whose note could be used as a template for documenting Greenwald's investment. Pakula said that he would instruct Parent to forward a copy of the note to Greenwald. Greenwald never received the form note. *Id.* ¶ 25.

Around this time, Pakula proposed to Greenwald that he become Chief Operating Officer ("COO") of Orb Communications and a member of its Board of Directors. Pakula indicated that this proposal, however, was contingent on Greenwald's making a personal investment. *Id.* ¶ 26.

On or about July 28, 1999, Pakula informed Greenwald that, prior to engaging Oxbridge for the private placement, he and Parent wanted a demonstration of Oxbridge's ability to attract venture capital firms. Accordingly, on July 30, 1999, Greenwald contacted SCP Private Equity Partners, L.P. ("SCP"), an investment subsidiary of Safeguard Scientific, a leading venture capital firm, and arranged a meeting on behalf of Orb Communications for August 5, 1999. The meeting took place on August 5, 1999, and SCP was sufficiently interested that the parties set up a further technical due diligence meeting to be held on August 18, 1999. *Id.* ¶ 27.

Having received no information from Defendants in response to his earlier requests for financial information, on or about August 9, 1999, Greenwald sent Pakula and Parent a list of questions concerning Orb Communications' finances. In addition, Greenwald requested Orb Communications' client contracts, senior executive employment contracts, technology descriptions, detailed income statements, balance sheets, cash flow statements, all outstanding contractual obligations including accounts payable, promissory notes, loans, option agreements, and capitalization tables, specific detail pertaining to accounts payable and accounts receivable, and corresponding aging reports. Greenwald also requested that Defendants and Parent forward the sample note, so that he would have time to review it prior to deciding whether to participate personally in the interim financing. *Id.* ¶ 28.

During the week of August 9, 1999, Greenwald, on behalf of Oxbridge, began an extensive rewrite of the Company's Executive Summary. Defendants delayed completion of this project by at least four weeks due to their slow responses to requests for information. During this period, Greenwald substantially revised and improved the Executive Summary and forwarded multiple draft versions to Defendants and Parent for their review. *Id.* ¶ 29.

Relying upon information supplied by the Defendants, the revised Executive Summary (the "Revised Executive Summary") listed 1999 revenues at $10 million. *See id.;* Exh. B. At no time before Greenwald invested $350,000 in Orb Communications or its retention of Oxbridge in connection with the private placement, both of which took place on August 20, 1999, did Defendants or Parent inform Greenwald that the 1999 revenue was grossly inflated. Indeed, at no time prior to August 20, 1999, did Defendants or Parent advise Greenwald of any inaccuracies in the Revised Executive Summary. Rather, Defendants approved the Revised Executive Summary and used it repeatedly in presentations to potential investors. *Id.* ¶ 30.

On or about August 13, 1999, Greenwald met with Pakula and Parent. At that meeting, Pakula and Parent told Greenwald that Orb Communications had many fi-

nancing options, including an offer from Madison Dearborn, L.P. ("Madison"), a Chicago-based investment group, and Grupo Oleri ("Grupo"), a mid-western direct marketing and investment company with ties to Madison Dearborn. Pakula claimed that Grupo had offered to invest between $1 million and $2 million, but that Defendants and Parent preferred to work with a New York-based group of investors. Parent claimed that he had proposed to Lunn that Oxbridge and First Albany work together with Grupo, but that Lunn had declined. *Id.* ¶ 31.

Also at the August 13, 1999 meeting, Pakula declared that he wanted to purchase computer servers to support accounts with Citicorp Inc. ("Citicorp") and PetSmart Inc. ("PetSmart"). He insisted that Greenwald immediately make his investment. In addition, Pakula stated that Orb Communications would not proceed with Oxbridge unless Greenwald made a personal investment of at least $300,000 and, further, that Orb Communications had to receive this interim financing by Friday, August 20, 1999. Pakula told Greenwald that Lunn also would be making a $25,000 personal investment in the Company on or around that date. *Id.* ¶ 32.

Pakula and Parent assured Greenwald that all proceeds of the investment would be used only for business expansion and that the equity holders of Orb Communications, Pakula and Berland, and also Parent, who was owed legal fees, would not receive any money until the next round of financing. Parent assured Greenwald that any personal investment by Greenwald would be in the form of debt which would be secured by the Orb Communications' revenues and assets and would grant Greenwald a senior liquidation preference. Parent promised that the note reflecting the terms of Greenwald's potential personal investment in Orb Communications would be delivered that day for Greenwald's review. No note was forwarded to Greenwald that day. *Id.* ¶ 33.

At one point during the August 13 meeting, when Pakula stepped out of the room, Parent reiterated to Greenwald that if he was unwilling to personally invest or cause a third party to invest at least $300,000, Oxbridge would not be given the private placement assignment. *Id.* ¶ 34.

As of August 13, 1999, Greenwald was still waiting for most of the requested information. Orb Communications had still not provided financials, capitalization tables, employment contracts, client contracts, or earlier due diligence packages in response to Greenwald's request. At the August 13, 1999 meeting, Pakula and Parent again promised to promptly provide all the previously requested information. *Id.* ¶ 35.

On August 18, 1999, in order to further induce Greenwald to invest, Pakula confirmed that PetSmart, purportedly Orb's biggest client, had increased its 1999 contract by $2.5 million. Based on Defendants' previous representations, this would mean that the company's 1999 revenues would increase from $10 million to $12.5 million during the latter half of 1999. *Id.* ¶ 36.

Also, on or about August 18, 1999, Pakula, Berland and Greenwald had a lunch meeting. Pakula and Berland again proposed that Greenwald join Orb Communications as COO and become a member of its Board of Directors. They agreed that Greenwald would become a member of the board, report directly to the CEO, Pakula, be non-exclusive to Orb Communications, receive a salary and compensation package similar to that of other senior executives, and receive 8% equity ownership. Pakula stated that he would have Parent prepare the employment agreement and that he would get everything in order so as to be

able to close the transaction with Greenwald as rapidly as possible. *Id.* ¶ 37.

On or about August 18, 1999, Greenwald received a draft of the note purporting to document the terms of Greenwald's investment in Orb Communications. The document did not reflect the terms negotiated among Pakula, Parent and Greenwald. As Parent was unavailable, Parent's newly hired associate drafted and negotiated the document. The associate admitted that he was unfamiliar with the transaction and that he was unfamiliar with Orb Communications. When Greenwald telephoned Pakula about this problem, Pakula told Greenwald that he would have to manage as best he could to finalize and fund the note within the next two days, by August 20, 1999, or else Pakula would accept another funding offer. Further, Pakula stated that the minimum investment required from Greenwald was now $350,000 and reminded Greenwald that if he did not make the investment by August 20, Oxbridge would also lose the private placement engagement and Greenwald would lose the promised COO position. *Id.* ¶ 38.

On August 20, 1999, relying on the information provided and representations made to Greenwald by Defendants, Greenwald invested $350,000 in Orb Communications under the terms of the Debenture. *See id.;* Exh. C. The Debenture is a debt security which purports to give Greenwald conversion rights and liquidation preferences over the holders of the Company's common stock. Complaint ¶ 39. The Debenture pays interest at the rate of 9% per annum and is due August 20, 2004. *See id.;* Exh. C.

In addition, on August 20, 1999, Greenwald and Pakula executed the engagement agreement (the "Engagement Letter"), pursuant to which Oxbridge acted as a co-advisor and as co-agent of Orb Communications in connection with a "best efforts"

private placement of up to $20 million of equity securities (the "Engagement"). The Engagement Letter is dated August 17, 1999, but Pakula did not execute it until August 20, 1999, subsequent to receiving Greenwald's funds. Complaint ¶ 40; Exh. D.

Also on August 20, 1999, Pakula promised Greenwald that he would deliver the remainder of the previously requested information by the following week. Complaint ¶ 41.

Subsequent to investing $350,000, Greenwald discovered that Defendants' representations to him about Orb Communications were false. *See Id.* at ¶¶ 43–46.

On or about Saturday, August 21, 1999, the day after Greenwald wired $350,000 to Orb Communications' bank account, Greenwald and Pakula met to discuss Greenwald's employment contract and Greenwald's efforts to raise capital. Pakula stated that he and Berland were excited about Greenwald's joining the company and that Greenwald's employment agreement would be forwarded to him right away. At that meeting, Pakula for the first time provided Greenwald with an electronic copy of the company's financial model (the "Model"), which supported many of the company's claims in the Revised Executive Summary. Pakula and Greenwald began to review the Model, but Pakula either had, or claimed to have, little working knowledge of it, as it had been developed by Sandy Oluwek ("Oluwek"), Orb Communications' bookkeeper. *Id.* ¶ 43.

Over the following week, Greenwald reviewed the Model and concluded that it had been engineered to show that Orb Communications required a capital investment far in excess of the actual amount needed. When Greenwald asked Pakula about this, Pakula plead ignorance and

said that Oluwek would fix whatever was wrong. *Id.* ¶ 44.

Subsequently, Greenwald learned that Pakula had directed Oluwek to pad expense categories in the Model to create the illusion of capital requirements far exceeding those actually required. For example, the Model showed the Company spending $80,000 per month for office leases. Pakula knew this was false. At a dinner meeting with Pakula and Berland on or about August 26, 1999, Pakula admitted to Greenwald that the Model had been rigged to show minimum required funding needs of $10 million. Pakula told Greenwald that Parent had advised that in order keep First Albany interested in the deal the Model should reflect the need for a large private placement. *Id.* ¶ 45.

Unwilling to rely on the Model, Greenwald began to build a new financial model. In doing so, however, Greenwald still relied upon information provided by Defendants. That information was either impossible to obtain or Defendants provided contradictory information. After creating an incomplete model, Greenwald told the Defendants that he would abandon the effort unless Defendants provided him with complete, accurate facts. *Id.* ¶ 46.

During the August 21, 1999 meeting, Greenwald learned for the first time that Pakula and Berland did not have a good working relationship. Pakula also stated that Berland did not share his vision and that she had very different ideas about Orb Communications' future. Pakula said that he and Berland had constant disagreements over the company's daily operations and long term goals. Pakula told Greenwald that Berland did not understand the power of Orb Communications' technology and that, therefore, they constantly clashed over the company's management. *Id.* ¶ 47.

In addition, on or about August 31, 1999, Greenwald discovered that Berland had been planning to take an extended leave of absence from Orb Communications beginning in January 2000 because of a medical condition. Defendants had made no mention of Berland's plans to take an extended leave or her medical condition prior to Greenwald's investment. *Id.* ¶ 48.

In addition, Defendants had misrepresented the centerpiece of Orb Communications' business, the ORBit 4.0 software. Defendants and Parent had repeatedly represented, including in statements contained in the Executive Summary delivered to Greenwald on June 18, 1999, that all of Orb Communications' software and technology had been developed in-house and were proprietary to Orb Communications. In fact, Orb Communications employed a number of technology consulting firms in connection with the development and maintenance of the software. Defendants knowingly misrepresented to Greenwald that these consultants were employees of Orb Communications. *Id.* ¶ 50.

On or about September 2, 1999, Pakula and Greenwald visited an off-site facility in Greenwich Village (the "Greenwich Village Facility") that had new computer servers and related equipment purchased with some of the proceeds of Greenwald's investment. Pakula had represented to Greenwald, prior to his investment, that this computer equipment was slated to serve the Citicorp and PetSmart accounts. The Greenwich Village Facility is highly secure and access is given only to individuals who are placed on access lists provided by the companies that use the facility. They discovered, however, that the new equipment was being used by Orb Communications' former Chief Technology Officer, Douglas Vunic ("Vunic"), to run software for Total Trading News, Inc. ("Trading News"). Vunic's new employer. Trading

News is owned by Berland's husband and, the Complaint asserts upon information and belief, by Berland as well. Orb Communications' valuable assets, purchased with the proceeds of the Debenture, were being used by another company in which Berland had a financial interest. *Id.* ¶ 51.

When Greenwald discovered this, Pakula feigned shock and claimed that he was concerned about what Vunic might do to the Orb Communications servers. He told Greenwald, contrary to his previous representations, that Orb Communications had been involved in an ongoing dispute with Vunic and had in fact considered pressing criminal charges against him for certain acts (which Pakula did not disclose to Plaintiff) committed by Vunic while he was still an Orb Communications employee. Thus, as of September 2, 1999, at least Berland, if not Pakula, knew that Orb Communications' newly purchased equipment was being used by Vunic for the benefit of Trading News. *Id.* ¶ 52.

On or about September 21, 1999, Defendants finally forwarded to Greenwald client contracts for Citicorp and Edgar Online Inc. ("Edgar"). Defendants had represented to Greenwald, prior to his investment, that the Citicorp contract would expire in mid–2000. Upon reviewing the contract, however, Greenwald learned that the Citicorp contract would actually expire on December 31,1999, or sooner at the option of either party. When Greenwald confronted Pakula with this fact, Pakula responded that he must have made a mistake and that Orb Communications would likely get an extension. *Id.* ¶ 53.

Defendants also refused to provide Greenwald with the contract for PetSmart, purportedly Orb Communications' largest and most important client. At the August 26 dinner meeting with Berland and Pakula, Greenwald learned for the first time that Berland was concerned about the

PetSmart account and that she feared that it might be reduced or canceled in the first quarter of 2000. When Greenwald asked Berland how PetSmart could cancel the contract given the Defendants' prior representations that PetSmart's fourth quarter 1999 and first quarter 2000 budgets were contractually guaranteed, Berland and Pakula refused to answer and changed the topic to Greenwald's funding efforts. *Id.* ¶ 54.

On or about September 16, 1999, Pakula, Berland, Parent and Greenwald held a breakfast meeting to discuss, among other things, Greenwald's funding efforts. Greenwald again explained that unless Defendants furnished the requested information and documentation, Greenwald had serious concerns about being able to move forward with the funding effort. Parent became hostile and asked which documents were being held back. Greenwald stated that he had been promised but had still not received the Orb Communications' capitalization table and documents relating to the other noteholder. Parent admitted that the company did not have a capitalization table. Pakula then interjected that he had a capitalization table but Berland disagreed with him and stated that one did not exist. Parent promised to rectify the situation by day's end. Parent then ended the meeting, but promised to continue the discussion via a conference call which he would arrange for that afternoon. No call took place. Moreover, Plaintiff has never received a capitalization table or any documents relating to Lunn's purported investment in the Company. *Id.* ¶ 55.

On or about October 13, 1999, Greenwald, as he proceeded with the Engagement in good faith, arranged for an investor presentation with Sandler Capital Management ("Sandler"). After the presentation, Sandler expressed interest and requested additional financial information.

222

Following the presentation, Pakula, Berland and Greenwald discussed the fact that Orb Communications did not have the requested information and that the company would need to make arrangements to prepare the materials. The Defendants later refused to forward the requested information. *Id.* ¶ 56.

Also, on or about October 13, 1999, Greenwald arranged an investor presentation with East River Ventures ("East River"). After the presentation, East River indicated that it was interested and requested additional financial information from Orb Communications. No information was provided. *Id.* ¶ 57.

On or about October 18, 1999, Greenwald arranged an investor presentation for Orb Communications with Hudson Ventures ("Hudson"). After a successful presentation, Hudson too expressed interest and requested additional financial information from Orb Communications. The company again refused to forward the requested information. *Id.* ¶ 58.

Plaintiff alleges that Defendants made misrepresentations concerning Orb Communications' revenue and valuation. For example, on or about August 23, 1999, during a meeting concerning Greenwald's fundraising efforts, Pakula and Oluwek met with Greenwald to review Greenwald's financial information question list. During the meeting, Pakula reconfirmed his earlier representations that the company's booked revenues for 1999 would be at least $10 million and that they had been accounted for in accordance with generally accepted accounting principles ("GAAP"). Although the $10 million revenue figure had been increased to $12.5 million because of the purported increase in the size of the PetSmart contract, Pakula stated that he wanted to be "conservative" such that the Revised Executive Summary would reflect the $10 million

revenue figure. Pakula also stated that Orb Communications followed the same revenue recognition procedures as other similar internet companies and that their accountant had approved this revenue recognition approach. In addition, Pakula told Greenwald that Orb Communications kept pristine records and that there were no outstanding judgments, active or threatened lawsuits, bankruptcies or past or present disputes involving Orb Communications. *Id.* ¶ 59.

On or about October 19, 1999, Greenwald met with Pakula and Berland and stated that he could not proceed with the Engagement unless they fully disclosed all pertinent information about Orb Communications. Defendants not only refused to provide this information, but announced that there was no back up for Defendants' previous claims of $10 million in 1999 revenues (later upwardly adjusted to $12.5 million). Pakula thus finally revealed that, notwithstanding his prior representations to Greenwald to induce him to invest and to induce him to assist in obtaining additional investors, Orb Communications' 1999 actual revenues would only be about $2 million, one-fifth of the $10 million originally represented to Greenwald. Pakula admitted that the company did not have $10 million, let alone $12.5 million in revenues and, moreover, that he had known this fact all along. Pakula explained that the company had been including its clients' media expenditures as part of its own revenues, which he knew was improper, but that he did not care because other similar Internet companies allegedly engaged in the same practice. Not surprisingly, Greenwald's relationship with Defendants soured when he refused to go forward with his fundraising efforts on any basis that included misrepresentations or a lack of full disclosure. *Id.* ¶ 60.

Pakula's knowing misrepresentation about Orb Communications' 1999 revenues and its purportedly proprietary technology had caused Greenwald to significantly overvalue the company in the Revised Executive Summary, which was prepared based upon the information provided by Defendants. Defendants consented to and approved the Revised Executive Summary and, in fact, used it at meetings with potential investors. At the October 19, 1999 meeting, Pakula acknowledged that he knew, prior to both Greenwald's investment and the execution of the Engagement Letter, that Greenwald was relying upon incorrect and fraudulent information, leading to a gross overvaluation of the company. Indeed, Pakula acknowledged that instead of the valuation of $50 million that Defendants were touting to potential investors, the company's more realistic value, as of October 1999, was between $6 million and $15 million, based on the actual estimated 1999 revenues of about $2 million. Pakula also revealed, for the first time, that Defendants had, prior to contacting Greenwald, consulted a number of investment banks concerning a potential private placement and had been informed that Orb Communications' value was well below $30 million. Pakula indicated that the previous valuations they had received were in the range of $10 million to less than $20 million. *Id.* ¶ 61.

After Greenwald learned of these intentional misrepresentations by Defendants, he told Defendants that he refused to go along with their scheme to use those misrepresentations to defraud another round of investors. Thereupon, the parties' relationship quickly deteriorated, and Defendants promptly withdrew their offer of the COO position and terminated the Engagement Letter on October 26, 1999. *Id.* ¶ 62.

After his investment in Orb Communications, Greenwald discovered that Defendants had made other misrepresentations during the negotiations leading up to his investment. For example, on or about August 5, 1999, Pakula told Greenwald that they were finalizing a contract with Barnes & Noble. As Greenwald later learned, Defendants had only a preliminary meeting with Barnes & Noble. The Barnes & Noble contract never materialized. *Id.* ¶ 63.

Similarly, prior to Greenwald's investment, Greene submitted to Greenwald a "client pipeline list" purportedly detailing extensive amounts of new business that was in the process of closing or was about to close. In fact, the "pipeline list" was only a wish list of potential customers, who never materialized. *Id.* ¶ 64.

During the term of the Engagement, Greenwald provided many services to Orb Communications for which he was never compensated that were beyond the terms of the Engagement Letter. For example, on or about August 20, 1999, the day Greenwald purchased the Debenture, Pakula asked Greenwald to contact SUN Microsystems, Inc. concerning an order for servers that were paid for with some of the proceeds of the Debenture. Greenwald did so and, shortly thereafter, the servers were delivered to the offsite Greenwich Village Facility. *Id.* ¶ 65.

On or about September 7, 1999, at the request of the Defendants, Greenwald met with and interviewed Matthew Marcella, a candidate for the position of Orb Communications' chief technology officer. *Id.* ¶ 66.

On or about September 10, 1999, Pakula complained to Greenwald that his network administrator and Oluwek could not negotiate a simple $2,000 computer lease. Pakula was unwilling to personally guarantee the lease. Greenwald agreed to assist in negotiating the computer lease and, in fact,

successfully did so by the close of business that day. *Id.* ¶ 67.

Despite Defendants' promise to Greenwald of a lucrative employment contract, Defendants never offered Greenwald a contract. On or about September 8, 1999, at the request of Pakula, Greenwald had prepared a draft of the employment agreement for the COO position. The parties were supposed to discuss the agreement at a meeting on September 16, 1999, but Defendants and Parent avoided the subject. In fact, no such discussion ever took place. By September 17, 1999, it became clear to Greenwald that Defendants and Parent had no intention of employing Greenwald and that, in fact, the proposed employment had been nothing but a ploy used to induce Greenwald to make his investment. *Id.* ¶ 68.

After Greenwald realized that he would not be employed by Orb Communications, he demanded payment for the services he provided to Orb Communications, all of which were outside the scope of his obligations under the Engagement Letter or as an investor. That request was denied. *Id.* ¶ 69.

In or about late October 1999, Greenwald learned that, because Orb Communications is a Subchapter S corporation which is permitted to issue only one class of stock under the tax laws, it had been improper for Orb Communications to issue the Debenture, which purported to give Greenwald conversion rights and preferences over Orb Communications' common stock. *Id.* ¶ 70. This constituted a breach of Orb Communications' warranties and representations in Section 4 of the Debenture that the issuance of the Debenture did not violate any law that applied to the company. *Id.* ¶ 71. Accordingly, on October 29, 1999, Greenwald, through his attorney, gave Orb Communications 30 days written notice to cure the breach, in accordance with the terms of the Debenture. *See id.;* Exh. E. On December 1, 1999, Greenwald, through his attorney, gave Orb Communications written notice of the default and of the acceleration of all payments due under the Debenture, in accordance with the terms of the Debenture. *See id.* ¶ 73; Exh. F.

## DISCUSSION

In determining a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court is required to accept as true the factual assertions in the complaint.[2] *See Charles W. v. Maul,* 214 F.3d 350, 356 (2d Cir.2000). A district court should grant such a motion to dismiss only where, viewing plaintiff's allegations in the light most favorable to him, "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

Rule 9(b) of the Federal Rules of Civil Procedure sets forth additional pleading requirements for fraud actions. Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting

---

**2.** The Court may also consider documents attached to the complaint. *See Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991). Defendants ask the Court to consider a document that Plaintiff did not attach to the Complaint: A June 26, 2000 letter from Greenwald rescinding his Notice of Default in respect of the Debenture he purchased. The Debenture is the subject of Greenwald's section 10(b) and Rule 10(b)–5 claim. Given Court's determination, set forth below, that Greenwald has not alleged sufficiently loss causation, the Court need not reach whether the June 26, 2000 letter, which post-dates the Complaint by six months, may be considered in the context of a Rule 12(b)(6) motion to dismiss.

fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). In addition, Congress amended both the 1933 and 1934 Acts by passing the Private Securities Litigation Reform Act ("PSLRA"). *See* Pub L. No. 104–67, 109 Stat. 737. In order to "curtail the filing of meritless lawsuits," the PSLRA imposed new and more stringent requirements on plaintiffs alleging securities fraud. *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000) (quoting H.R. Conf. Rep. No. 104–369, at 41 (1995) (internal quotation marks omitted)). In relevant part, the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . .

15 U.S.C.A. § 78u–4(b)(1)(West 1997 and Supp.2001). In addition, "in any private action . . . in which plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u–4(b)(2) (West 1997 and Supp.2001).

The Second Circuit has concluded that, through the PSLRA's amendments to the securities laws, Congress "effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Novak,* 216 F.3d at 310. Accordingly, the Court of Appeals has directed district courts to use the analysis established in existing precedents when determining whether a plaintiff has met his burden of pleading a "strong inference" of scienter. *See id.* at 311 ("[W]e hold that the PSLRA adopted our 'strong inference' standard . . . . Therefore, in applying this standard, district courts should look to the cases and factors . . . [already established by this Circuit.]") (citations omitted).

█ In cases involving alleged material omissions or misstatements, in order to state a claim with the requisite particularity a complaint "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

*Exchange Act Section 10(b) and Rule 10b–5*

Section 10(b) of the Exchange Act prohibits the use of any manipulative or deceptive device or contrivance in connection with the purchase or sale of securities. 15 U.S.C.A. § 78j(b) (West 1997 & Supp. 2001).

Rule 10b–5 describes more specifically what constitutes a manipulative or deceptive device or contrivance:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To

make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase of any security.

17 C.F.R. § 240.10b–5 (2001).

In the Second Circuit, "to state a claim for relief under Section 10(b) and Rule 10b–5, Plaintiffs must allege that each defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Livent, Inc. Securities Litigation*, 78 F.Supp.2d 194, 213 (S.D.N.Y.1999) (citing *In re IBM Corp. Securities Litigation*, 163 F.3d 102, 106 (2d Cir.1998)).

The plaintiff must also allege that he suffered economic loss as a result of these misstatements or omissions ("loss causation") and that a reasonable investor would have considered them important in making his investment decisions ("transaction causation"). *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

*Loss Causation*

Defendants argue that Greenwald has not stated a cause of action under section 10(b) or Rule 10(b)–5 because he has failed to plead adequately loss causation. The Court agrees. "It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered

into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001) (quoting *Suez Equity Investors v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001)). "While transaction causation is generally understood as reliance, loss causation has often been described as proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Id.* "The loss causation inquiry typically examines how directly the subject of the [misrepresentation] caused the loss, and whether the resulting loss was a foreseeable outcome of the [misrepresentation], while also taking into account issues such as the presence of intervening causes and the lapse of time between the behavior complained of and the loss." *Id.* (citation omitted and internal quotations omitted).

In *Castellano*, the Second Circuit held that:

plaintiffs may allege transaction and loss causation by averring both that they would not have entered the transaction but for the representations *and* that the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of the transaction.

*Id.* at 188 (quoting *Suez Equity Investors*, 250 F.3d at 97–98). A Section 10(b)/Rule 10b–5 plaintiff must allege that he suffered economic loss as a result of these misrepresentations or omissions. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Moreover, "as a general matter, a defrauded buyer is entitled under Rule 10(b)–5 to recover 'only the excess of what he paid

over the value of what he got.'" *Gurary v. Winehouse*, 190 F.3d 37, 46 (2d Cir. 1999), *cert. denied*, —— U.S. ——, 122 S.Ct. 66, 151 L.Ed.2d 33 (2001) (citations omitted). Because the Complaint is devoid of allegations regarding any losses Greenwald suffered in connection with the purchase of the Debenture, he has not plead sufficiently a cause of action under Section 10(b) or Rule 10(b)–5.

Greenwald alleges that, had he known that Orb Communications' revenues were less than Pakula represented, that Pakula and Berland did not have a good working relationship, that contracts with key customers were not locked in and that Orb Communications' core technology was not proprietary, he would not have purchased the Debenture. This alleges sufficient transaction causation, *i.e.*, that but for Defendants' misrepresentations, he would not have invested in the company, but fails to allege sufficiently loss causation. The Complaint's allegations of financial loss are, indeed, few and far between. In its opening paragraph, the Complaint asserts generally that Greenwald was "defraud[ed] ... of $350,000." Complaint ¶ 1. In the second paragraph, Greenwald alleges that "As a result of ... material misrepresentations and omissions by Defendants, Plaintiff invested in Orb [Communications] and he suffered damages considerably in excess of $350,000, which Plaintiff's investment has permitted Orb to survive and enabled Orb and its principals to move closer to realizing the significant profits available to Internet companies." *Id.* ¶ 2. Seventy-seven paragraphs later, Greenwald asserts that he "has been damaged by Defendants' [Section 10(b)/Rule 10–b5] violations as described herein," but does not say how or to what extent. *Id.* ¶ 79. Paragraph 94 (common law fraud count) alleges damage to Greenwald's professional reputation and seeks to recover for the value of certain personal services he alleg-

edly provided. The breach of contract claim, turning on the alleged breach of legal compliance warranty in the Debenture due to the inconsistency of the conversion provision with Subchapter S requirements, again asserts generally that "Plaintiff Greenwald has been damaged." *Id.* ¶ 103. Greenwald's quantum meruit claim seeks $152,000 for services performed. *Id.* ¶ 109. Greenwald's unjust enrichment count asserts that Orb Communications has benefitted by more than the value of the Debenture (indeed it asserts that the investment has made Orb Communications a more secure and viable business entity) and that Orb Communications was unjustly enriched to the extent of the value of Greenwald's uncompensated time and services. *Id.* ¶¶ 116–118. A third-party beneficiary count seeks damages for alleged breach of the Orb Communications–Oxbridge Engagement Letter. *Id.* ¶¶ 124, 126. Even in the prayer for relief, Counts I to IV are lumped in an unspecified prayer for compensatory and/or punitive damages.

Nowhere in the Complaint does Greenwald allege any economic default or other economic loss in respect of the debt security he purchased, or any disparity between what he paid for that security and whatever he would claim to have been its true value. In other words, careful review of the Complaint reveals that there is no allegation that Greenwald has suffered a loss on the security, much less that the alleged misrepresentations and omissions were the proximate cause of such a loss. The Complaint does not draw a connection between the Defendants' misrepresentations and any foreseeable loss suffered by Greenwald on the Debenture as a result of the purchase of that security.

Greenwald does allege that he provided services without compensation, that Orb Communications received benefits from his

services for which he was not compensated, and breach of contract claims arising out of the fact that the Debenture is not properly a convertible security. None of these allegations, however actionable in contract or other state law causes of action, amounts to a claim arising under Section 10(b) and Rule 10b–5 that he suffered any losses arising from his purchase of the Debenture.

Having concluded that Greenwald has failed to allege loss causation, a necessary element of a Section 10(b) and Rule 10b–5 claim, the Court need not determine whether the remaining elements of Greenwald's Section 10(b) and Rule 10b–5 claim have been alleged sufficiently or whether Greenwald's fraud allegations otherwise meet the specificity requirements of Rule 9.

Accordingly, Greenwald's Section 10(b) and Rule 10(b)–5 claim is dismissed. Without a primary violation of the securities laws, there is no violation under Section 20(a). *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994). Thus, because Greenwald's Section 10(b) claims are dismissed, his Section 20(a) claim is also dismissed. In addition, Greenwald's state law claims are dismissed because there is no appropriate basis for the Court's jurisdiction over these state law claims in light of the dismissal of the federal.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Complaint is granted. Counts I and II of the Complaint are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted; Counts III through VIII (claims for common law fraud, breach of contract, quantum merit, unjust enrichment and breach of contract-third party

beneficiary) are dismissed without prejudice for lack of subject matter jurisdiction.

Any application to interpose an amended complaint shall be served and filed within thirty (30) days from the date hereof.

SO ORDERED.