Clifford **WEIDBERG**, Plaintiff,

v.

Stewart **BARNETT** and Nicholas Aversano, Defendants.

No. 09–cv–948 (ADS)(WDW).

United States District Court, E.D. New York.

Nov. 27, 2010.

Burkhart Wexler & Hirschberg LLP, by David Hirschberg, Esq., Ian J. Frimet, Esq., of Counsel, Garden City, NY, for the plaintiff.

Cullen and Dykman, LLP, by James G. Ryan, Esq., Cynthia Ann Augello, Esq., Justin F. Capuano, Esq., of Counsel, Garden City, NY, for the defendant Stewart Barnett.

Schupbach, Williams & Pavone, LLP, by Paul R. Williams, Esq., of Counsel, Garden City, NY, for the defendant Nicholas Aversano.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This case arises out of a dispute among the former co-owners and a former executive of Iron Horse Bicycle Co., LLC ("Iron Horse"), a company that designed and manufactured high-end bicycles. In his complaint, the plaintiff and former Iron Horse co-owner, Clifford Weidberg, alleges that former Iron Horse co-owner Stewart Barnett looted the company with the aid of former Iron Horse Chief Financial Officer Nicholas Aversano. The case is before the Court based on diversity jurisdiction. The defendants Barnett and Aversano now each move for summary judgment to dismiss all of the plaintiff's claims against them. For the reasons that follow, the Court grants both of the defendants' motions for summary judgment, with limited leave to replead.

## I. BACKGROUND

In 2001, the plaintiff Clifford Weidberg and defendant Stewart Barnett formed and each took an equal stake in Iron Horse Bicycle Co., LLC, a Nevada based limited liability company. Although organized in Nevada, Iron Horse's offices were in Holbrook, New York, where Stewart Barnett worked with defendant Nicholas Aversano. At all times Weidberg worked from Florida, where he lived.

Iron Horse was not the only company that Weidberg and Barnett owned together. In 1996, Barnett purchased from Weidberg a 50% stake in two bicycle companies that Weidberg owned at the time called World Wide Cycle Supply, Inc. ("World Wide Cycle") and Iron Horse Bicycle Co., Inc. ("IH, Inc."). Both World Wide Cycle and IH, Inc. would later be reorganized to be fully owned by a company called C & S Equity Holdings Corp. ("C & S· Holdings"), in which Barnett and Weidberg then took an equal interest. Barnett paid Weidberg for his 50% stake in these entities by signing a $200,000 promissory note in 1996, which remained unpaid until Weidberg cancelled the note in 2008.

From 1996 through May 2008, Barnett managed all the daily operations of Iron Horse, World Wide Cycle, and IH, Inc. In 1999, Barnett hired the defendant Nicholas Aversano to prepare the financial statements for World Wide Cycle. When Iron Horse was formed in 2001, Aversano became Iron Horse's Chief Financial Officer.

Also shortly after its formation, Weidberg and Barnett obtained financing for Iron Horse through CIT Financial Group ("CIT"), which required both Weidberg and Barnett each to personally guarantee $250,000 of Iron Horse's credit line. Later, in March 2006, Barnett sought to increase this credit line for Iron Horse, and CIT agreed to do so if both Barnett and Weidberg augmented their personal guarantees of the credit line to cover $750,000 each. In May 2006, Barnett and Weidberg acceded to this request, and CIT increased Iron Horse's credit line.

According to Weidberg, this credit line increase—and Weidberg's own increase in his personal guarantee—was the first part of a scheme that Barnett created to enrich himself at Iron Horse's expense. Weidberg alleges that starting in September 2005, Barnett, who managed all of Iron Horse's books with the help of Aversano, began overstating Iron Horse's value to convince CIT to increase its line of credit to Iron Horse. Barnett never told Weidberg that he was inflating Iron Horse's

value, and when CIT increased its loan to Iron Horse in May 2006, Barnett and Aversano allegedly "appropriated a substantial amount of the loan proceeds for their own personal use." (Compl., ¶ 19.)

Weidberg alleges that Barnett and Aversano followed up on this scheme by proceeding to loot Iron Horse by (1) personally retaining payments by Iron Horse distributors that were owed to Iron Horse, (2) covering up their fraud by paying suppliers with funds unrelated to the sale of the suppliers' products, and (3) taking kickbacks from certain suppliers. Then, in September 2007, Barnett and Aversano allegedly set out to again inflate Iron Horse's financial condition for the purpose of hiding their ongoing looting of the company. To this end, Barnett and Aversano used accounting "tricks"—such as booking income from sales before they occurred, not deducting certain expenses from the company's bottom line, and misstating the value of the company's inventory—to show a profit rather than a loss for fiscal 2007.

According to Weidberg, he became aware of the latest scheme to inflate Iron Horse's value after reviewing Iron Horse's preliminary financial statements in January 2008. However, Weidberg asserts that he remained ignorant at that time of the other efforts by Barnett and Aversano to overvalue and loot the company. On May 12, 2008, Weidberg's concerns about the defendants' latest scheme were confirmed when Aversano executed an affidavit stating that Barnett had instructed him to inflate Iron Horse's financial condition.

Shortly thereafter, on May 23, 2008, Weidberg, Barnett, and Iron Horse entered into an agreement (the "May 23, 2006 Agreement") whereby, as a result of "certain management disagreements and financial issues," (Barnett Aff., Ex. A at 2), Barnett sold his stake in both C & S Holdings and Iron Horse back to Weidberg in exchange for cancellation of the $200,000 promissory note that Barnett had given to Weidberg in 1996. The May 23, 2006 Agreement also contemplated the fact that Iron Horse would likely have to restate its finances to indicate a loss rather than a profit, and that Iron Horse would therefore likely receive a rebate on its prior-paid taxes. In an apparent acknowledgement that he should not personally benefit from this rebate, Barnett agreed to allow Iron Horse to keep as a loan any tax refund due to him as a member, and he also agreed to loan additional cash to Iron Horse. Finally, although Barnett was relinquishing his ownership stake in the company, Iron Horse agreed to re-hire Barnett as Senior Managing Director for Sales and Purchasing. On June 1, 2008, Barnett and Iron Horse executed an employment agreement effecting this result.

After Weidberg bought Barnett's stake in Iron Horse and C & S Holdings on May 23, 2008, Iron Horse struggled financially for the next nine months. Weidberg alleges that, to prevent CIT from foreclosing on his loan guarantee during this period, he was forced to stop taking a salary from the company and to invest an additional $250,000 of his own money into Iron Horse. Finally, on March 2, 2009, Iron Horse filed an involuntary petition for Chapter 7 bankruptcy protection, which was converted to a Chapter 11 petition on April 6, 2009. As of the time of the filing of the defendants' motions, Iron Horse remained in bankruptcy.

On March 6, 2009, four days after Iron Horse filed for bankruptcy, Weidberg commenced the present lawsuit against Barnett and Aversano. Weidberg asserts four causes of action: (1) against both Barnett and Aversano he asserts a cause of action for breach of the defendants' fiduciary duties; (2) against Aversano alone, he as-

serts a cause of action for aiding and abetting Barnett's breach of his fiduciary duties; (3) against Barnett alone, he asserts a cause of action for fraudulently inducing him to contract to increase his personal guarantee of the CIT loan; and (4) against Barnett alone, he asserts a cause of action for breach of the May 23, 2008 Agreement, based on Barnett's failure to make certain loans to Iron Horse.

On April 30, 2009, and then by amended answer on July 22, 2009, Barnett answered Weidberg's complaint, and asserted counterclaims against Weidberg for: (1) a declaratory judgment that the May 23, 2008 Agreement was superseded entirely by the June 1, 2008 employment agreement between Barnett and Iron Horse; and (2) defamation, based on Weidberg's alleged statements to third parties that Barnett had taken money from Iron Horse and defrauded CIT. Barnett also cross-claimed against Aversano for indemnification. On his part, Aversano answered Weidberg's complaint on April 6, 2009, and similarly cross-claimed against Barnett for indemnification.

On May 6, 2009, before discovery had been completed and even before Barnett amended his answer and counter-claims, Barnett and Aversano each separately moved for summary judgment dismissing all of the plaintiff's claims against them. Barnett and Aversano assert that summary judgment is appropriate because three of Weidberg's causes of action can be asserted only by Iron Horse, and there are no damages associated with Weidberg's fourth cause of action. Weidberg opposes both motions.

## II. DISCUSSION

### A. Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under Fed.R.Civ.P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" within the meaning of Fed.R.Civ.P. 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

Finally, the Second Circuit has held that, when a motion for summary judgment is made prior to the close of discovery, a party resisting summary judgment based on the need for discovery must show, "what facts are sought to resist the motion and how they are to be obtained, [as well as] (2) how those facts are reasonably expected to create a genuine issue of material fact. . . ." *Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) (internal quotations, alterations, and citations omitted).

### B. As to the Plaintiff's Causes of Action for Breach of Fiduciary Duty, Aiding and Abetting a Breach of Fiduciary Duty, and Breach of Contract

The Court begins by addressing together three of the plaintiff's four causes of action, because the defendants assert the same basis for dismissing all three: that the causes of action are solely within the province of Iron Horse to assert, and may not be pursued by Weidberg. The first of these three claims is the plaintiff's cause of action for breach of fiduciary duty against Barnett and Aversano. Weidberg asserts that, as managers of Iron Horse—and in the case of Barnett, as a co-owner of Iron Horse—Barnett and Aversano owed him fiduciary duties of care and loyalty, and that they breached these duties by misstating the financial condition of Iron Horse and then looting the company. In the second cause of action, asserted in the alternative and against Aversano alone, Weidberg alleges that Aversano aided and abetted Barnett's violation of his fiduciary duties. The third cause of action is against Barnett alone for breach of contract, and is based on Barnett's alleged failure to perform under the Mary 23, 2006 Agreement. In particular, Weidberg alleges that Barnett failed to make certain loans to Iron Horse that were required under that contract.

In their respective answers to the complaint, Barnett and Aversano deny the basic facts of Weidberg's assertions. However, for the purposes of this motion, they do not assert that Weidberg has insufficient proof to succeed on these causes of action. Rather, Barnett and Aversano seek summary judgment on the ground that Weidberg has no standing to assert any of these three claims. Barnett and Aversano maintain that these causes of action belong not to Weidberg, but to Iron Horse, and that because Iron Horse is in bankruptcy, only the trustee for the Iron Horse estate may assert them.

■ The parties do not dispute that, as a general matter and with certain exceptions not applicable here, bankruptcy law precludes anyone but the trustee of a bankrupt entity from asserting causes on behalf of the entity. *See, e.g., St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 701–02 (2d Cir.1989). Thus, to the extent that Weidberg's claims do belong solely to Iron Horse and/or its trustee, the Court does not have jurisdiction to hear them. Moreover, the Court notes that even if Weidberg could assert claims on behalf of Iron Horse, any claim that Weidberg asserted derivatively would require the joinder of Iron Horse as an indispensible party plaintiff pursuant to Fed.R.Civ.P. 19. *See, e.g., Bartfield v. Murphy,* 578 F.Supp.2d 638, 645 (S.D.N.Y. 2008). However, Iron Horse shares New York citizenship with the defendants Aversano and Barnett. Therefore, Iron Horse's joinder would destroy the Court's diversity jurisdiction, and Weidberg would be precluded from pursuing any derivative claim in this Court even if the bankruptcy code did not apply here.

■ Therefore, the pivotal issue affecting the validity of Weidberg's claims is

whether Weidberg's causes of action are direct or derivative. Generally, to determine whether a person is asserting a cause of action directly or on behalf of a corporate entity, federal courts look to the law of the state where the relevant entity was incorporated. *See Bartfield*, 578 F.Supp.2d at 645; *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 400, fn. 8 (S.D.N.Y.2010). Here, Iron Horse was incorporated in Nevada, so Nevada law would ordinarily apply to this question. However, the Second Circuit and the New York Court of Appeals have held that, when a corporate person has minimal ties to its place of incorporation and has strong contacts with New York, then New York law may be applied to the internal affairs of that corporate person. *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263–64 (2d Cir.1984); *Greenspun v. Lindley*, 36 N.Y.2d 473, 369 N.Y.S.2d 123, 330 N.E.2d 79 (1975); *Anwar*, 728 F.Supp.2d at 400, fn. 8. Here, all three parties apply New York law to the governance of Iron Horse's internal affairs, and except for Weidberg's residence in Florida, all of the relevant events in this case appear to have happened in New York. Further, there appears to be no connection between Iron Horse and Nevada except for Iron Horse's incorporation there. Thus, based on these factors and on the parties' implicit agreement that New York law applies here, the Court applies New York law to the question of whether Weidberg's causes of action are derivative or direct.

Applying New York law, the parties do not dispute that members and managers of limited liability companies owe fiduciary duties not just to the LLC, but also directly to the members of the LLC. *See, e.g., Berman v. Sugo LLC*, 580 F.Supp.2d 191, 204 (S.D.N.Y.2008). Since fiduciary duties are owed both to an LLC and its members, a court must apply the "direct injury test" to discern whether a breach of these duties gives rise to a claim that may be asserted directly by an LLC member, or that must be asserted on behalf of the LLC. *Excimer Associates, Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 139–40 (2d Cir.2002). Explaining this test, the Second Circuit has held that "the critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 238–39 (2d Cir.1999); *accord Excimer Associates, Inc.*, 292 F.3d at 139–40. However, the mere fact that a corporation may also bring an action based on acts that caused an independent injury to a shareholder does not make the shareholder's suit derivative. *See Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir.1993).

The Second Circuit applied these standards in its decision in *Ceribelli*, and a brief review of the facts of that case may help to illuminate this sometimes opaque area of law. In *Ceribelli*, the defendants formed a cooperative that owned a residential building in Manhattan, and then sold the cooperative to the plaintiffs, while misrepresenting the physical condition of the building it owned. *Ceribelli*, 990 F.2d at 63. The court held that the plaintiffs *could* assert a direct action against the defendants based on these facts, because the sale of the cooperative shares at inflated prices harmed the plaintiffs directly, and did not actually harm the cooperative. *Id.* at 65. However, by way of counterexample, the court also stated that it was "doubtful" that the plaintiffs could have asserted a direct action against the defendants if the plaintiffs had formed the cooperative themselves, and then the cooperative had purchased the overpriced residential building from the defendants. *Id.* In that case, the defendants would

have primarily defrauded the cooperative, and the plaintiffs would be forced to assert any claim against the defendants derivatively.

■ Applying this law to the present case, the Court finds that the allegation that the defendants breached their fiduciary duties by (1) taking improper cash payments from Iron Horse distributors, (2) diverting funds to themselves, and (3) otherwise looting Iron Horse, properly belongs to Iron Horse. Assuming the truth of the plaintiff's allegations, the defendants' acts harmed Iron Horse directly by decreasing its value, and only harmed Weidberg indirectly by reducing the worth of his ownership stake in Iron Horse. This is a quintessentially derivative claim, similar to the counterfactual example in *Ceribelli* in which the defendants defrauded the cooperative selling it a faulty building, and unlike the actual facts of Ceribelli, in which the defendants defrauded the plaintiffs directly by selling them overpriced shares. Thus, to the extent the plaintiff seeks to proceed on his breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims based on this theory, the Court grants summary judgment in the defendants' favor without leave to replead.

■ The issue of whether the plaintiff may assert a claim for breach of fiduciary duty based on the defendants' alleged failure to faithfully represent the financial condition of Iron Horse is more complicated. As a general matter, members and managers of an LLC under New York law owe a specific fiduciary duty to other LLC members to fully disclose all information concerning the limited liability company. *See Salm v. Feldstein,* 20 A.D.3d 469, 470, 799 N.Y.S.2d 104 (2d Dep't 2005) (permitting a plaintiff to assert a direct breach of fiduciary duty claim against a co-owner of LLC who failed to disclose a high-value

offer for the LLC from a third party); *Blue Chip Emerald LLC v. Allied Partners Inc.,* 299 A.D.2d 278, 279–80, 750 N.Y.S.2d 291 (1st Dep't 2002) (similar facts); *Bartfield,* 578 F.Supp.2d at 648 ("The duty of full disclosure is one owed by [one member to another], not one owed to [the LLC], and can support a direct suit."). Thus, under the case law, the defendants' alleged misrepresentations to Weidberg of the value of Iron Horse would ordinarily provide a basis for a direct claim.

However, at least in his complaint, Weidberg expresses a theory of damages that is derivative. He alleges that the defendants' misstatements of the value of Iron Horse caused the plaintiff "to suffer damages from the diminution of the value of his company in the amount of $5 million." (Compl., ¶ 38.) As *Ceribelli* illustrates, harm that a plaintiff suffers only due to a diminution of value in his ownership interest of an entity is indirect harm, and must be remedied through a derivative claim.

Nevertheless, Weidberg attempts to cure this deficiency in his opposition papers. Although he makes no request to amend his complaint, he identifies several "separate and distinct injuries" that he suffered as a result of the defendants' breaches of fiduciary duty, including his loss of his "job, health benefits, [and] retirement contributions, etc." (Pl.'s Resp. to Barnett's Mot. for Sum. J. at 15.) The plaintiff further asserts in his opposition papers that, as a result of the defendants' breaches of their fiduciary duties, "his reputation in the bicycle industry has been destroyed and his ability to access credit has been diminished," and he has "spent hundreds of thousands of dollars in legal representation as a result of the Iron Horse Bankruptcy that Barnett caused, and the negotiations with CIT." (Id. at 15–

16.) The Court has some concern that, at least as presented by the plaintiff, these damages are also derivative of the harm allegedly caused to Iron Horse. Nevertheless, in the interests of justice, the Court grants the plaintiff leave to replead this theory of damages to demonstrate how the defendants' alleged misstatements of Iron Horse's value directly caused the damages that the plaintiff describes.

In addition, the plaintiff offers in his affidavit one theory of damages that is plainly non-derivative. In that affidavit, the plaintiff suggests that the defendants' misstatements of Iron Horse's finances led him to purchase Barnett's interest in Iron Horse and C & S Holdings for approximately $200,000, at a time when those entities were virtually valueless. (Weidberg Aff. in Opp. to Barnett's Mot. for Sum. J., ¶¶ 16–17.) This allegation is similar to the actual facts of *Ceribelli*, in which the plaintiffs were permitted to assert a direct claim against a defendant who knowingly sold an overvalued corporate interest to the plaintiffs. Of course, while this harm is not derivative, the plaintiff failed to allege it in his complaint. The Court therefore grants leave to replead in this regard.

In sum, the Court dismisses the plaintiff's claims against the defendants for breach of fiduciary duty and aiding and abetting breach of fiduciary duty for lack of standing, but grants the plaintiff leave to replead this cause of action consistent with the rulings in this opinion.

■ As for the plaintiff's breach of contract claim against Barnett, the Court finds that this is also a derivative cause of action, and that amendment of this claim would be futile. While it is true that the plaintiff is a signatory to the contract that Barnett is alleged to have breached, the duty that Barnett is accused of failing to perform was owed to Iron Horse, not to Weidberg. Specifically, the contract required Barnett to make certain loans to Iron Horse, which Barnett never made. Any harm suffered by Weidberg as a result of this non-performance was derivative of the harm caused to Iron Horse. Thus, Weidberg may not assert his breach of contract claim directly against Barnett, and the Court grants Barnett's motion for summary judgment dismissing the plaintiff's breach of contract cause of action for lack of standing.

In this regard, the Court notes that the fact that discovery has not been completed in this case does not alter the Court's determinations on these issues, as the plaintiff has not identified any evidence that could be uncovered during discovery that would be reasonably expected to create triable issues of fact concerning the plaintiff's standing to sue the defendants. *See Gurary*, 190 F.3d at 43.

## C. As to the Plaintiff's Cause of Action for Fraudulent Inducement to Contract

The plaintiff's final cause of action is for fraudulent inducement to contract, based on the allegation that Barnett's misstatements concerning Iron Horse's value caused the plaintiff to agree to increase his personal guarantee of Iron Horse's CIT credit line from $250,000 to $750,000. In seeking summary judgment dismissing this claim, Barnett does not assert that the plaintiff is barred from asserting this cause of action because it is a derivative claim. Rather, Barnett points to undisputed evidence that the Iron Horse estate has satisfied CIT's claim on its loan in its entirety, and thus contends that Weidberg can identify no damages caused by the increase in his personal guarantee. Weidberg disputes this conclusion.

The parties agree that, as of the date of Barnett's motion for summary judgment, CIT had been fully paid by the Iron Horse estate and was not asserting any claims against Weidberg. However, also at that time, CIT reserved its rights to seek recovery from Weidberg—and Barnett—based on their guarantees, should the payment to CIT be reversed or should other unexpected expenses arise. (*See* Aff. of Nicholas Feretic, ¶ 6.) Weidberg argues that this remaining contingent liability means that he has still been damaged by Barnett's alleged fraud, in spite of the fact that CIT is not presently seeking to recover from him. On the other hand, Barnett maintains that any damage to Weidberg is speculative, and that Weidberg's claim is therefore not ripe for adjudication. The Court agrees.

■ As a general matter, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (internal quotations and citations omitted); *accord Atlantis Information Technology, GmbH v. CA, Inc.*, 485 F.Supp.2d 224, 234 (E.D.N.Y.2007) (Spatt, J.) ("the Plaintiff may not plead a speculative claim that did not exist at the time of the filing of the complaint and as of the present time, still does not exist"); *Edrei v. Copenhagen Handelsbank A/S*, No. 90–cv–1, 1991 WL 64201, *4–5 (S.D.N.Y. Apr. 18, 1991) ("Damages cannot be based on speculation."). Here, CIT is presently making no demand based on the plaintiff's personal guarantee of its loan to Iron Horse. Further, any amount that Weidberg might become liable for in the future depends on events that cannot be predicted with certainty. Therefore, under the law, the plaintiff's claim is not ripe.

■ As with the plaintiff's previous causes of action, in his opposition papers the plaintiff asserts an alternative theory of damages for this claim. In explaining his alternative theory, the plaintiff contends, first, that his guarantee allowed Iron Horse to borrow more money than it had previously borrowed, and that Iron Horse was soon "unable to pay its revolving credit line to CIT." (Pl.'s Opp. to Barnett's Mot. for Sum. J. at 13.) As a result, CIT then "threatened to withdraw the credit line," and Weidberg was "forced" to contribute $250,000 of his own money to Iron Horse to satisfy CIT. (Id. at 13–14.) The plaintiff asserts that he eventually lost his entire $250,000 contribution, and also spent "hundreds of thousands of dollars" on legal fees related to negotiations with CIT and Iron Horse's bankruptcy. (Id. at 14.)

Ignoring the fact that this alternative theory was not plead in the complaint, *see, e.g., Mahmud v. Kaufmann*, 607 F.Supp.2d 541, 555 (S.D.N.Y.2009) ("Generally, courts will not consider, on a motion for summary judgment, allegations that were not pled in the complaint and raised for the first time in opposition to a motion for summary judgment."), the Court finds that the plaintiff's allegations are insufficient to demonstrate damages arising from Weidberg's increase of his personal guarantee. While Weidberg's agreement to increase his guarantee may have permitted Iron Horse to borrow more money, his alleged damages depend on Iron Horse in fact borrowing more money, and then failing to repay that money. In the Court's view, the damages that then allegedly resulted to the plaintiff from these events are not sufficiently connected to Barnett's alleged wrongdoing to revive the plaintiff's claim for damages.

The Court thus grants Barnett's motion for summary judgment dismissing the

plaintiff's cause of action for fraudulent inducement to contract on ripeness grounds. The Court notes that this dismissal is without prejudice to the plaintiff's right to reassert this claim should it later become ripe. As stated previously, the Court's conclusion on this issue is not altered by the fact that discovery has not been completed in this case, as the plaintiff has not identified any evidence that could be uncovered during discovery that would be reasonably expected to create a triable issue of fact concerning the ripeness of the plaintiff's cause of action. *See Gurary*, 190 F.3d at 43.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the defendants' motions for summary judgment to dismiss the plaintiff's causes of action for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are granted on standing grounds, with leave to replead consistent with this opinion within twenty days of the date of this decision; and it is further

**ORDERED** that the defendant Barnett's motion for summary judgment dismissing the plaintiff's cause of action for breach of contract is granted on standing grounds; and it is further

**ORDERED** that the defendant Barnett's motion for summary judgment dismissing the plaintiff's cause of action for fraudulent inducement to contract is granted on ripeness grounds.

**SO ORDERED.**